**ELSMERE PARK CLUB LIMITED PARTNERSHIP, a Delaware Limited Partnership, Plaintiff,**

v.

**TOWN OF ELSMERE, the Honorable Patricia M. Blevins, and Mark D'Onofrio, Defendants.**

Civ. A. No. 90–424 (JRR).

United States District Court, D. Delaware.

Aug. 6, 1991.

Roderick R. McKelvie and Ann M. Badmus of Ashby, McKelvie & Geddes, Wilmington, Del., for plaintiff.

Edward M. McNally and Barbara D. Crowell of Morris, James Hitchens & Williams, Wilmington, Del., for defendants.

OPINION

ROTH, Circuit Judge.[*]

The present dispute arose in the aftermath of a severe flood in the Town of Elsmere on July 5, 1989. Following the flood, the Town of Elsmere ("Town") condemned the thirty-nine basement level apartments in a 195 unit apartment complex (the "Apartments") owned by Elsmere Park Club Limited Partnership ("Elsmere Park"). Thereafter, the Town refused to issue Elsmere Park a building permit to restore the basement apartments, and on April 10, 1990, the Town Council passed an amendment to the Town's zoning ordinance which operated to prohibit any further use of the Elsmere Park basement apartments for residential purposes. Elsmere Park then brought this action against the Town, Mayor Patricia M. Blevins ("Blevins"), and Town Manager Mark D'Onofrio ("D'Onofrio"), alleging that it had suffered a taking without just compensation and a denial of its substantive due process rights.

Presently before this Court are the parties' cross-motions for summary judgment. We heard oral argument in this action on June 21, 1991, and ruled preliminarily from the bench that both motions would be granted in part and denied in part. We now write to explain our ruling and our analysis more fully.

FACTS

The parties are essentially in agreement as to the course of events involved in this action. The controversy began when on July 5, 1989, the Little Mill Creek overflowed in a rainstorm, causing the Town to suffer a severe flood. This flooding affected the thirty-nine basement level units of the 195 units in the Elsmere Park Apartments. Pursuant to the Town's zoning ordinance in effect at the time of the July 5th flood, the Apartments qualified as a valid nonconforming use. Moreover, Section 603 of that ordinance provided that any nonconforming building that was destroyed by a natural disaster "to an extent of less than

[*] At the time this case was briefed and argued, Judge Roth was a District Judge for the United States District Court for the District of Delaware. She presently serves on the United States Court of Appeals for the Third Circuit.

fifty (50%) percent of the recorded true valuation" could be repaired and continued as a nonconforming use. (Docket Item 9B at A–449). The parties agree that the extent of flooding damage to the Apartments amounted to less than 50% of their value, and that under Section 603, Elsmere Park would have been permitted to repair the basement level units.

On July 7, 1989, however, Town Manager D'Onofrio wrote to inform Elsmere Park that the Town was condemning the basement level apartments "because of unsanitary conditions caused by the flood of July 5, 1989." (D.I. 9B at A–500). Following the condemnation, Elsmere Park's attorney wrote on August 17th to request that the Town delineate the steps necessary for it to gain approval to reopen the Apartments. D'Onofrio responded by letter of September 20th, stating that the Mayor and Town Council had "expressed serious reservations in permitting re-opening" of the basement apartments, and informing Elsmere Park that the Town was "currently in the process of drafting an ordinance" to address the issue. (D.I. 9A at A–10).

The Town Council confronted the issue of the flooding damage and threat of future problems at its meeting on October 25, 1989. At that meeting, on a motion by Mayor Blevins, the Council voted to delay the issuance of a building permit to Elsmere Park until the Council had had an opportunity to adopt an appropriate ordinance. (D.I. 9A at A–13—A–14). The Council also voted to direct the Town Solicitor to draft an ordinance prohibiting residential use of apartments below ground level in the flood plain. (D.I. 9A at A–15—A–17). Thereafter, the Town Solicitor drafted what eventually became Ordinance No. 247. The first and second readings of the draft ordinance were held on November 9, 1989. (D.I. 9B at A–484—A–485).

Following the October 25th Council meeting, the Town Council and the Town Planning Commission further considered solutions to the flooding problem at a series of meetings during the period from November, 1989 through March, 1990. Representatives of Elsmere Park attended and partic-ipated in many of these meetings, and suggested various solutions as alternatives to the proposed ordinance. Elsmere Park's efforts included hiring an engineering consulting firm to study the flooding problem and present a report to the Town. Also during this time, Elsmere Park's attorney and Town officials exchanged a series of letters on these issues. Ultimately, however, on April 10, 1990, the Town Council approved and enacted Ordinance No. 247.

Thereafter, on May 2nd, Elsmere Park formally applied for a building permit to restore its basement level apartments. By letter of May 18, 1990, D'Onofrio informed Elsmere Park that a building permit was no longer required, but that given the earlier condemnation of the basement apartments, a new certificate of occupancy was necessary. D'Onofrio further stated that due to the newly adopted Ordinance No. 247, any application for a certificate of occupancy would be denied. (D.I. 9B at A–506).

Ordinance No. 247 (D.I. 9B at A–484—A–485) amended the zoning laws of the Town in several respects. First, it required that applicants for building permits for even minor construction in the flood plain district, must meet all new regulations governing buildings in the flood plain. Second, it amended Section 603 to mandate compliance with the requirements for new construction in order to repair nonconforming buildings in the flood plain, regardless of the extent of damage to the building. Finally, the ordinance prohibited the issuance of a certificate of occupancy for any dwelling in the flood plain in which the majority of habitable space was below flood level. As the parties agree, if applied to Elsmere Park, this ordinance prohibits using the thirty-nine basement units as apartments.

In this action, Elsmere Park first challenges the Town's decision to delay Elsmere Park's application for a building permit until a new zoning ordinance had been adopted. More specifically, it contends that the zoning ordinance in effect as of July 5, 1989, and through April 9, 1990, should have been applied to its request to reopen its basement apartments, and that

the refusal to grant its request constituted a violation of substantive due process. Second, Elsmere Park argues that applying Ordinance No. 247 to the Apartments constitutes an unconstitutional taking of property without just compensation.

## DISCUSSION

This action is before us on the parties' cross-motions for summary judgment. Thus, pursuant to Fed.R.Civ.P. 56, we must determine whether there exist any genuine issues of material fact, and if not, which party is entitled to a judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, we will separately analyze the two acts challenged by Elsmere Park: the decision to delay action on Elsmere Park's request for a building permit and the application of Ordinance No. 247 to the Apartments. We will then consider the specific defenses asserted as to the two individual defendants.

I. *Whether the Delay of Elsmere Park's Application Violated its Substantive Due Process Rights*

■ Elsmere Park contends that the defendants' refusal immediately after the flood to apply the then-existing zoning laws to the Apartments constituted a denial of its substantive due process rights. As an initial matter, we note that to the extent that Elsmere Park challenges the actual condemnation of the basement units on July 7, 1989, this claim lacks merit. Section IV of Town Ordinance No. 76, the Sanitary Code of the Town of Elsmere, authorizes the Town to order that a dwelling be vacated if the dwelling is "unfit for human habitation, or dangerous to life or health." This ordinance also prohibits any further use of such a dwelling until the condition has been remedied and approval has been obtained. (D.I. 12A at A–131— A–132). Thus, the condemnation due to unsanitary conditions was fully authorized as a matter of local law, and did not constitute an arbitrary action rising to the level of a due process violation.

■ Yet, following the initially lawful decision to condemn the basement apartments, the Town refused to grant Elsmere Park permission to remedy the unsanitary and unhealthful conditions. Elsmere Park's challenge to this decision to delay action on its building permit application thus raises more serious concerns. In support of its due process argument, Elsmere Park cites the Eleventh Circuit's decision in *Southern Cooperative Development Fund v. Driggers,* 696 F.2d 1347 (11th Cir.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983). *Southern Co-op.* involved a developer whose subdivision plat application was initially rejected despite its acknowledged compliance with all applicable subdivision regulations, and was denied again after a court-ordered reconsideration in which the commission applied newly adopted regulations. The Eleventh Circuit found a violation of due process because the defendants had "take[n] advantage of a new law enacted while an application for plat approval, valid when filed, ha[d] been unlawfully delayed." *Id.* at 1354. The *Southern Co-op.* court further noted that since the plaintiff was not challenging the validity of the new law, the standard was not whether the action was "arbitrary and capricious" under *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), but was whether the defendants' actions were justified under state law, and if not, whether they rose to the level of a Due Process Clause violation. 696 F.2d at 1351.

In a similar, though less factually on point, case, the Third Circuit has also held that a municipality's deliberate and arbitrary decision to delay or deny issuing a building permit may violate a developer's substantive due process rights. *See Bello v. Walker,* 840 F.2d 1124 (3d Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988). *Bello* involved a claim that council members improperly interfered with the building permit application process for personal and political reasons unrelated to the application's merits. *Id.* at 1129. Thus, as in *Southern Co-op.* and the present case, the developer did not chal-

lenge the law itself as arbitrary and capricious, but argued that town officials improperly refused to apply the law to its permit application. The Third Circuit held that these allegations stated a substantive due process claim, although the court declined to define "the outer limits of the showing necessary to demonstrate that a governmental action was arbitrary, irrational, or tainted by improper motive." *Bello*, 840 F.2d at 1129.

In addition, we find further support in the Ninth Circuit's opinion in *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir.1988). *Bateson* concerned a developer, who applied for a building permit for a condominium project, and modified his plan in response to city officials' objections. The city nonetheless rejected his claim and initiated a zone change on the developer's property which would make the proposal illegal. *Id.* at 1302. The Ninth Circuit found that the city's arbitrary decision to reject the plan despite the developer's full compliance with the requirements for a building permit, violated his substantive due process rights. *Id.* at 1303.

In fact, the events at issue in the present action closely approximate those involved in both *Southern Co-op.* and *Bateson.* Like the permit applications in those cases, Elsmere Park's request for a building permit complied with the law as it existed at the time. As defendants concede, under the zoning ordinance in effect at the time Elsmere Park requested a building permit, Elsmere Park was entitled to repair the flooding damage and resume its valid nonconforming use. Moreover, while we agree that the Town acted lawfully in condemning the basement level apartments under its health code, we do not believe that this justified D'Onofrio's September 20th letter to Elsmere Park, or the Town Council's vote in October, 1989 to delay issuing a building permit to Elsmere Park until a new zoning ordinance had been adopted. Elsmere Park had requested that the Town set forth the steps necessary for it to receive approval to reopen the basement units, and the Town possessed no legal authority to defer this request until the law could be rewritten. Consequently, the Town Council's actions constituted unlawful delay in violation of substantive due process under *Bello, Southern Co-op.,* and *Bateson.*

■ On the present record, however, there remain genuine issues of material fact as to the extent of Elsmere Park's damages, if any, because the evidence before us does not provide a sufficient basis upon which to calculate the damages suffered. The measure of damages is the fair rental value Elsmere Park could have earned during the applicable period in which it was denied the use of the basement apartments. *See, e.g., Public Serv. Co. v. Bath Iron Works Corp.,* 773 F.2d 783, 793 (7th Cir.1985). Although it is not clear from the facts presented, it appears that Elsmere Park never had the opportunity to repair the basement units, and consequently the repair costs that it would have incurred must be subtracted from this amount.

Moreover, we cannot presently determine the period of time for which Elsmere Park is entitled to such damages for the Town's unlawful refusal to apply its earlier zoning ordinance. The outside boundaries of the applicable period are marked by the date on which the Apartments were condemned on July 7, 1989, and April 10, 1990, when the Town Council adopted Ordinance No. 247.[1] From this time period we must subtract the time necessary to complete repairs of the flooding damage, but the record does not indicate how long this would have required. We are also presently unable to determine whether it is appropriate to date the commencement of the damages period from the time of the decision to delay action on Elsmere Park's application rather than from the condemnation on July 7th. Nor is it clear whether the Town's decision to delay should be dated from Elsmere Park's August 17th letter requesting instructions

---

**1.** The reasons for our setting April 10, 1990 as the cut-off date are set forth in Section II of this Opinion.

on how to reopen the units, from D'Ono-frio's September 20th letter in response, or from the actual vote to delay on October 25th. Finally, defendants may be able to prove that in the absence of lobbying by Elsmere Park, the Town Council would have passed Ordinance No. 247 much earlier than April 10, 1990.

Therefore, we will grant summary judgment in favor of Elsmere Park on its claim that defendants' decision to delay violated Elsmere Park's substantive due process rights, and will deny defendants' cross-motion on this claim. Because genuine issues of material fact still exist on Elsmere Park's claim for damages, we will deny both parties' motions for summary judgment on the damages issue.

## II. *Whether Application of Ordinance No. 247 to Elsmere Park's Apartments Constitutes an Unconstitutional Taking Without Just Compensation*

■ Elsmere Park next contends that although it agrees that Ordinance No. 247 is valid, the application of the ordinance to the Apartments constitutes a taking without just compensation in violation of the Fifth Amendment as applied to the states through the Fourteenth Amendment. Elsmere Park argues that not only does it possess property rights in the Apartments, but it also owns vested rights in the property's status as a nonconforming use. *See, e.g., Blundell v. City of West Helena,* 258 Ark. 123, 522 S.W.2d 661, 666 (1975) ("It is widely recognized that a property owner has vested rights in a non-conforming use of his property."). These vested property rights, it contends, cannot be taken without just compensation.

The Supreme Court has identified two factors of particular relevance in determining whether a regulation constitutes a constitutional taking. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). First, we must examine the purpose of the regulation, because the Court has been reluctant to find a taking if the regulation at issue advances a public purpose and "mere-ly restrains uses of property that are tantamount to public nuisances." *Id.* at 491, 107 S.Ct. at 1245. Second, we must determine the extent to which the regulation prevents the property owner from using his or her property, because in order to find that a taking has occurred the diminution of value and investment backed expectations must be sufficiently severe. *Id.* at 493, 107 S.Ct. at 1246. In the present case, we find that both of these factors compel the conclusion that the application of Ordinance No. 247 to the Apartments does not constitute a constitutional taking.

### A. Public Purpose of Advancing Health and Safety

Under the purpose prong of takings analysis, courts have recognized that when legislation is designed to protect the health and safety of the community, it will not be considered to constitute a taking. This rule dates from the Supreme Court's decision in *Mugler v. Kansas,* 123 U.S. 623, 668, 8 S.Ct. 273, 300, 31 L.Ed. 205 (1887) that legislation designed to prevent conditions "injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." More recently, the Supreme Court has stated that "Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." *Keystone Bituminous Coal,* 480 U.S. at 492 n. 22, 107 S.Ct. at 1246 n. 22. Similarly, the Court has noted that when "a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the Supreme] Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

In the present case, Ordinance No. 247 was adopted to protect the property and personal safety of tenants from the demonstrated danger of future floods. Consequently, it easily qualifies as a health and

safety measure serving important public interests. Elsmere Park concedes that the ordinance serves a legitimate legislative purpose and that as a result the ordinance itself is valid, but argues that this admittedly acceptable public purpose does not entitle the Town to disturb Elsmere Park's vested interests in its nonconforming use. We disagree.

■ While Elsmere Park is correct that it possesses protected property interests in the basement level apartments, these vested interests do not trump the Town's ability to apply its ordinance to Elsmere Park. As the Supreme Court stated in *Penn Central*, when supported by a public purpose, land use regulations may destroy property interests without constituting a taking. 438 U.S. at 125, 98 S.Ct. at 2659. Moreover, under these principles courts, considering facts very similar to those at issue here, have found that no taking occurred. Perhaps most closely on point, was the decision in *Dock Watch Hollow Quarry Pit, Inc. v. Township of Warren*, 142 N.J.Super. 103, 361 A.2d 12 (N.J.Super.Ct.App.Div.1976), *aff'd per curiam*, 74 N.J. 312, 377 A.2d 1201 (1977), which involved the application of a regulatory ordinance to a quarry that qualified as a nonconforming use under state law. The *Dock Watch* court held that:

> although the fact that the quarry is a nonconforming use may protect it from later zoning restrictions, its status as such does not render it immune from reasonable regulations pursuant to the police power in the interest of the public health, welfare and safety.

361 A.2d at 20.

Similarly, in *First English Evangelical, Lutheran Church of Glendale v. County of Los Angeles*, 210 Cal.App.3d 1353, 258 Cal.Rptr. 893 (Cal.Ct.App.1989), (on remand from, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)), *cert. denied*, —— U.S. ——, 110 S.Ct. 866, 107 L.Ed.2d 950 (1990), the court considered the application of regulations to a church's buildings that had been destroyed by flood. The ordinance at issue was adopted to prevent harm from flooding, and it prohibited any reconstruc-

tion of the destroyed buildings. The United States Supreme Court had remanded the case for a determination of whether a taking had occurred. 482 U.S. at 313, 107 S.Ct. at 2385. The California court found the ordinance at issue did not constitute a taking, relying at least in part on the public safety exception. 258 Cal.Rptr. at 898–901.

Elsmere Park attempts to distinguish *Dock Watch* and *First English* as involving only undeveloped property. As to *First English* it contends that once the buildings were destroyed, the prior use was eliminated, and subsequently the property must be treated as undeveloped. Yet, there is no basis in takings law to support such a distinction between developed and undeveloped property. Moreover, the case cited by Elsmere Park which best supports its position is readily distinguishable. That case, *Oswalt v. County of Ramsey*, 371 N.W.2d 241 (Minn.Ct.App.1985), involved the condemnation of a single family house that qualified as a nonconforming use in a floodway district. The house was condemned for near collapse, and the owners were ordered to comply with new building requirements if they chose to repair the house. The court held that this constituted a taking. *Id.* at 247.

The *Oswalt* decision, however, did not reject or refuse to apply the public safety exception; rather, the opinion never even discusses the issue, nor is there any indication that the town confronted any particular safety threat comparable to the July 5, 1989 flood in Elsmere. Moreover, this case involved a single home and its occupants, and not thirty-nine apartments rented to unknowing tenants. In addition, the court relied at least in part on the surreptitious nature of the government's actions: it did not pass a new ordinance in light of issues of public safety, but applied an unrelated statute to eliminate an existing nonconforming use. 371 N.W.2d at 247.

Finally, we note that two other cases cited by Elsmere Park provide even less support for its position. *State ex rel Nealy v. Cole*, 442 S.W.2d 128 (Mo.Ct.App.1969), only considered the permissibility of a regulation for a 70 foot setback and did not

involve any public safety issues, and *Bates v. Stiteley*, 84 R.I. 458, 125 A.2d 108, 110 (1956), construed the ordinance at issue to permit repairs to hurricane damaged buildings, and only contained dicta on the importance of protections for nonconforming uses.

Thus, we conclude that because Ordinance No. 247 serves important public purposes in protecting the health and safety of Town residents, it may be applied against otherwise protected property interests. As a result, application of the ordinance to the Apartments does not constitute a taking.

### B. Extent of Deprivation of Use of Property

An additional and perhaps even stronger ground for concluding that application of Ordinance No. 247 to the Apartments does not constitute a taking, is that Elsmere Park has not been deprived of all use of its property. In challenges to land use regulations, "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). As the Third Circuit has observed, the Supreme Court has found a taking "only in cases in which the value of the property was reduced drastically ... [and has] cited approvingly cases in which the challenged law had reduced the value of the land by as much as seventy-five and eighty-seven percent," and still no taking was found. *Rogin v. Bensalem Township*, 616 F.2d 680, 692 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981) (citations omitted).

This extent of deprivation takings inquiry focuses on the property rights of the owner and his or her investment backed expectations. Yet, "even where distinct, investment-backed expectations are involved, a taking through an exercise of the police power occurs only when the regulation 'has nearly the same effect as the complete destruction of [the property] rights' of the owner." *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1033 (3d Cir.) (citation omitted; alteration in original), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987). Under this analysis, Elsmere Park has not suffered a taking for two reasons.

First, Ordinance No. 247 only affects the thirty-nine basement level units, and does not prevent Elsmere Park from renting out the 156 upper level apartments. In contesting this point, Elsmere Park argues that it is deprived of 100% of the use of the basement level apartments, and that the entire apartment building is not the appropriate unit of measurement. In support of this contention, however, it merely states that all the cases defendants cite which state that the whole property is the unit of measurement involved undeveloped property. It does not cite any authority for applying a different unit of measurement in cases involving buildings. More importantly, in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court held that the air rights for the space above Grand Central Station should not be considered separately from the rest of the parcel in determining the extent of the deprivation at issue. As the Court stated: " 'Taking' jurisprudence does not divide a single parcel into discreet segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Id.* at 130, 98 S.Ct. at 2662. Since *Penn Central* involved the highly developed property of New York's Grand Central Station, we reject Elsmere Park's contention that a different standard should apply to the present case.

Second, even focusing solely on the basement units, Ordinance No. 247 only prohibits *residential* use of this area. While Elsmere Park may have had an investment backed expectation of using the basement level units as apartments, there are several possible alternative uses consistent with use of the building as a whole for apartments. For example, the basement units may be converted into laundry facilities, a storage area, a lounge, or a weight room/health club for residents. In fact, any of these uses may make the other 156 apart-

ments more attractive to residents, and thereby enable Elsmere Park to earn greater rental income from these remaining apartments.

As a result, we conclude that Elsmere Park has not suffered a sufficient diminution in its investment backed expectations to qualify the Town's actions as a taking. Even when Ordinance No. 247 is applied to the Apartments, Elsmere Park can still profitably operate the vast majority of units as apartments.

### III. *Specific Defenses for Individual Defendants*

In their motion for summary judgment, defendants have also asserted specific defenses as to the two individual defendants, Mayor Blevins and Town Manager D'Onofrio. Because we have found that the decision to delay acting on Elsmere Park's application for a building permit violated its substantive due process rights, we must consider these arguments that the individual defendants should not be held liable.

### A. Assertion that Mayor Blevins was Not Involved

Defendants contend that Mayor Blevins took no executive actions to prevent Elsmere Park's use of the basement level apartments, and that consequently she should be dismissed as a party to this action. We reject this argument. First, D'Onofrio's September 20, 1989 response to Elsmere Park's request that the Town delineate the steps necessary to reopen the basement units, specifically stated that "[t]he *Mayor* and Council of the Town of Elsmere have expressed serious reservations in permitting the re-opening of the basement level dwelling units." (D.I. 9A at A–10) (emphasis added).

More significantly, the transcript of the October 25, 1989 Town Council meeting reflects that it was Mayor Blevins who raised the issue of delaying Elsmere Park's building permit application, and that it was on her motion that the Council voted to do so. At the meeting, Mayor Blevins stated:

[T]hey [Elsmere Park] have applied for the building permit to rehab. all those apartments. They have made [an] application. Now is the time that we have to start looking at that ... We need to have a motion to either delay or not delay issuance of the building permit ...

So, I think what we need tonight would be two motions, one to delay the building permit until these ordinances could be considered, and secondly, a motion to have these ordinances drawn up.

(D.I. 9A at A–13—A–14).

Since the decision to delay issuance of a building permit was precisely the act upon which our above finding of a constitutional violation was based, it is clear that Mayor Blevins was involved in the specific acts giving rise to liability. Consequently, we will not dismiss Mayor Blevins as a party.

### B. Qualified Immunity

■ Second, defendants contend that both Mayor Blevins and Town Manager D'Onofrio are protected by qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), because their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Under this standard, rights are considered "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). More specifically, if there is no case directly addressing the type of conduct at issue, officials are protected by qualified immunity if "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Social Serv. for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir.1989). This is an objective standard.

As of the summer of 1989 when the Elsmere flood occurred, the Town's zoning laws and the above-cited court decisions on substantive due process were all clearly established. The earlier zoning laws which

would have permitted Elsmere Park to repair the basement apartments had been adopted years before. A reasonable official would consequently have known that existing local law required the approval of Elsmere Park's application. Moreover, by the time of the July 5th flood, the substantive due process cases of *Bello v. Walker,* 840 F.2d 1124 (3d Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988), *Southern Cooperative Development Fund v. Driggers,* 696 F.2d 1347 (11th Cir.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983), and *Bateson v. Geisse,* 857 F.2d 1300 (9th Cir. 1988), had all been decided.

As a result, Blevins and D'Onofrio are not entitled to qualified immunity for their acts. We therefore decline to grant summary judgment in their favor on this ground.

## CONCLUSION

In the immediate aftermath of the July 5, 1989 flood, Elsmere Park was entitled under then-existing zoning laws to repair the basement level apartments and resume their operation as a valid nonconforming use. Defendants' deliberate and arbitrary decision to ignore this entitlement and delay acting on Elsmere Park's building permit application violated Elsmere Park's substantive due process rights. Yet, the Town's subsequent adoption of Ordinance No. 247 and decision to apply this ordinance to the Elsmere Park Apartments did not constitute a taking. The ordinance was passed in furtherance of public health and safety concerns, and it did not deprive Elsmere Park of the all use of its property. There remain, however, genuine issues of material fact as to the extent, if any, of Elsmere Park's damages for the period between the unlawful decision to delay action on its permit application and the enactment of Ordinance No. 247.

Thus, Elsmere Park's motion for summary judgment will be granted as to its claim that the decision to delay action on its building permit violated substantive due process, and will be denied as to all other claims. We will also grant defendants' motion for summary judgment on the takings claim, but will deny the remainder of defendants' motion. As a result, the only remaining issue for determination in this action is the extent of Elsmere Park's damages. An appropriate order will follow.