954 P.2d 250 (1998)
134 Wash.2d 947
MISSION SPRINGS INC., a Washington corporation, and Feature Realty, Inc., a California corporation, appellants,
v.
The CITY OF SPOKANE; The Spokane City Council; Roger Crum as City Manager of the City of Spokane; Jack Geraghty and Jane Doe Geraghty; Mike Brewer and Jane Doe Brewer; Phyllis Holmes and John Doe Holmes; Joel Crosby; Chris Anderson and Jane Doe Anderson; Bev Numbers and John Doe Numbers; and Orville Barnes and Jane Doe Barnes, Respondents.
No. 63836-5.
Supreme Court of Washington, En Banc.
Argued January 21, 1997.
Decided April 23, 1998.
*251 Frank Conklin, Spokane, for Appellants.
James C. Sloane, City Attorney, Gregory G. Staeheli, Kain Snow & Staeheli, Meriwether D. Williams, Winston & Cashatt, Patrick J. Dalton, Assistant City Attorney, Milton G. Rowland, Spokane, for Respondents.
*252 SANDERS, Justice.
Mission Springs, Inc.[1] commenced this civil rights action against the City of Spokane and local officials pursuant to RCW 64.40 and 42 U.S.C. sec.1983 for alleged wrongful refusal to process a grading permit. The trial court dismissed all claims on summary judgment; however, on direct review, we reverse and remand.[2]

I. The Issue
The ultimate issue is whether a municipality may withhold a ministerial land use permit for reasons extraneous to the satisfaction of lawful ordinance and/or statutory criteria. We hold it may not and recognize RCW 64.40 and 42 U.S.C. sec.1983 provide a remedy.

II. Facts
Those facts important to the resolution of the issue at hand are not seriously disputed.
On August 31, 1992 the Spokane City Council adopted Ordinance No. C-30529 approving Mission Springs' application for a planned unit development (PUD) comprised of 790 apartment units located within approximately 33[3] separate buildings. This final approval followed submittals by the developer setting forth the nature of the proposed development in sufficient detail to enable the city council to affirmatively determine pursuant to RCW 58.17.110 that the development made adequate provision for "the public health, safety, and general welfare and for such open spaces, drainage ways, streets or roads, alleys, other public ways, transit stops, potable water supplies ....", etc. RCW 58.17.110(2)(a). The record shows a public hearing was held on November 5, 1991, Clerk's Papers (CP) at 202, wherein evidence was taken on these matters. Thereafter the hearing examiner concluded on November 25, 1991 that the PUD application should be granted, subject to various conditions. CP at 202.
The record also demonstrates it was well known to the developer and local government officials the addition of a 790-unit apartment complex at this location would necessarily cause a predictable increase in traffic upon adjacent roads and highways subsequent to ultimate construction and occupancy. That this factor was fully considered by all concerned there can be no doubt as the developer submitted a traffic study detailing the likely traffic increase as a result of the apartment build-out with specific reference to the likely routes of travel. See CP at 245, 304 (describing 1991 traffic impact study). We also note that it was known, or should have been known, to all concerned as of the date of final approval on August 31, 1992, the developer was statutorily vested with the legal right to build out the planned improvements identified in the PUD for a period of five years under the ordinances, statutes, and regulations in effect at the time of the August 1992 approval "unless the legislative body finds that a change in conditions creates a serious threat to the public health or safety in the subdivision." RCW 58.17.170. No such finding, however, was ever made.
Mission Springs obtained grading and building permits for the project by early 1993 but, for reasons of its own, did not utilize them prior to their expiration in May 1994. However, in October 1994, Mission Springs submitted a new application for a grading permit in identical form to the old one containing all components[4] required by Spokane Municipal Code (SMC)4.03.020 (repealed and superseded by art. 8, ch. 11.02, ord. C-31607(1996)). This code applies not only to *253 grading permits but building permits as well as several other types of permits.
On June 22, 1995[5] Mr. Irv Reed, Spokane's building officer, briefed the Spokane City Council:
We are ready to issue the grading permit. The legal department has reviewed the process. We have completely gone through it and we're ready to issue the grading permit.[[6]]
CP at 75.
Notwithstanding, the City withheld the grading permit several months.[7] The circumstances pertaining to refusal to issue this permit are largely detailed in the transcript of the June 22, 1995 council meeting which followed Mr. Reed's introductory remarks and comprise the gravamen of Mission Springs' complaint.
It appears Mission Springs was given no notice that its project would even be the subject of discussion at the June 22 meeting, thus it had no reason to attend and did not attend. CP at 74. However, project opponents had apparently been notified by the City Council that such a meeting would take place as Mayor Geraghty opened the meeting by stating "I know some people are here to hear what the current status of the Mission Springs thing is." CP at 75. The Mayor clarified that only "phase one" of the project was ready to proceed and that phase one involved only 193 units divided between 8 buildings housing 24 units each. CP at 76. It was also established from the outset that the Department of Transportation and the developer were in agreement that this phase should proceed. As City Council Member Holmes stated, "And it's between them and DOT, it has nothing to do with us." CP at 78.
Building Official Bob Eugene reported that although there was a potential deficiency in 16-foot roadway tunnels under nearby railroad rights-of-way, "the tunnels are adequate to service the traffic that will be generated from the project."[8] CP at 81. The record also references a statement by City Council Member Anderson that a neighborhood opposition group had been formed which had hired an attorney to (presumably) fight the project. CP at 85. Various aspects of the project were discussed at which point the Mayor stated, "The question was whether council has any action that it can do at this point." CP at 89. From there the following dialogue ensued:
[Council Member Phyllis] Holmes: If we were to direct Bob [Eugene] not to issue permits until the tunnels were improved, what would happen?
[City Attorney James] Sloane: What would happen is that it would be the genesis of a cause of action by the developer against the city for unlawfully interfering with the issuance of a building permit and that is essentially the same basis that we're presently in federal court on, a civil rights violation. The other issue is that it's a charter violation.
A person: It's a charter violation?
[City Attorney] Sloane: It's a charter violation.
A person: How so?
[City Attorney] Sloane: The council has no administrative authority by the terms of the city charter. The council acts through ordinances and set[s] policy. The city administrative staff is charged with following ordinances. The property owner is entitled to a right to rely on the vested right he has at the time he files his building application, to have it considered under the existing legislative scheme and an effort to *254 change that scheme is a violation of due process.
. . . .
[Council Member] Holmes: Well, I'm going to put a motion on the table and see where we go with this. I'm going to move that we request a current staff report on the traffic impact on the Thorpe tunnels of the additional units based on current traffic use. If there are any studies that we have would be old [sic] and we delay issuance of that permit until that report has been brought forward to the county.
[Council Member] Anderson: I'll second that.
Mayor Geraghty: We have a motion seconded. I'm inclined to support this, but I want to know what the downside is.
[City Attorney] Sloane: The downside, looking at the traffic issue separately for a moment, if the rules are that when a property owner comes forward with a request for a building permit, he's entitled to have his project considered under the rules that are in place at the time he filed his application. When a project has progressed to the extent that the Thorpe Road project has proceeded, most of those issues, if not all of those issues, have been resolved. The one that we have identified here is the wetlands, the four subsequent phases. Any interference with the issuance of a building permit when a property owner is entitled to that building permit gives rise to a claim under state law and under federal law. It is essentially the same claim that was made by Mr. Ronald with regard to the Ronald property. At this point the issue of traffic I believe has been resolved and Mr. Ramsey and Mr. Eugene are here and they can speak to the specifics of it, but I believe that's the case with regard to the Mission Springs project.
[Council Member] Anderson: You know, I guess I would add that, you know, with all due respect I think we owe an obligation to the other members of the community who have serious concerns about the traffic problems up in that area.... I guess too my feeling is, and I think this is a great motion. We have the opportunity to put a stop to this and let's just see what happens. Let's see how confident they are. If they bring a suit, we can always turnaround and issue the permit, that's an option still available to us.

Mayor Geraghty: At the moment did your motion cover grading permit or the building permit?
[Council Member] Holmes: Any permits, it did not specify....
CP at 89-94 (emphasis added). The motion carried unanimously. As a direct and proximate result of this city council motion, City Manager Roger Crum and his subordinates refused to further process or issue the grading permit until after August 14, 1995, the date the City Council[9] rescinded its prior directive. CP at 383.
On July 3, 1995 Mission Springs filed its complaint seeking money damages and injunctive relief pursuant to RCW 64.40.020[10] and 42 U.S.C. sec.1983.[11] The City of Spokane, *255 the Spokane City Council, City Manager Roger Crum, Mayor Jack Geraghty, and each member of the City Council, plus their spouses, were named defendants although council defendants Barnes and Crosby, who did not participate in the council meeting, were named in their "official capacity" only. Plaintiffs later attested the delay attributable to the city council action caused the developer damage plus attorney fees. CP at 490.
Ultimately all defendants moved for summary judgment of dismissal whereas plaintiffs sought summary judgment striking claims of absolute legislative immunity and for a declaration that the City Council had violated the city charter. The trial court dismissed all claims on summary judgment. This appeal, and direct review by this court, follows.

III. Legal Analysis
As previously recounted, the process for PUD approval and build-out is set forth in RCW 58.17. These requirements are often supplemented by local ordinance. Final approval of the PUD represents a final determination by the local unit of government that the proposal satisfies all applicable statutory and ordinance requirements. RCW 58.17.195 ("No plat or short plat may be approved unless the city, town, or county makes a formal written finding of fact that the proposed subdivision or proposed short subdivision is in conformity with any applicable zoning ordinance or other land use controls which may exist."). It is also essential to recall PUD approval entitles the applicant to build out to previously approved specifications within five years of the date of approval as a matter of vested legal right based upon the same ordinances which were in effect as of the date the final approval had been obtained[12] "unless the legislative body finds that a change in conditions creates a serious threat to the public health or safety in the subdivision." RCW 58.17.170. The analysis here is quite simple since no relevant laws changed during the period in question and no finding was made by the legislative body as referenced in the cited statute.
Without material dispute of fact it appears these defendants abrogated Mission Springs' right to obtain issuance of a grading permit when the City Council acted to deny issuance of this or any permit and the City Manager acquiesced in the council's demands.
That the City Manager willfully withheld the permit from issuance upon, or in prevention of, satisfaction of ordinance criteria during the June through August 1995 period upon the motion of the City Council is not disputed. Nor is it denied the City Council acted contrary to the legal advice of its own city attorney, and in no uncertain terms.
The issue here is not whether or not the Spokane City Council can lawfully request its city manager to perform at municipal expense such additional studies as it may see fit but rather is whether the statutory and constitutional rights of Mission Springs were violated when its right to obtain this grading permit upon satisfaction of ordinance criteria was abrogated pending the completion of such additional studies.
This question of lawful entitlement is in no way dependent upon the actual length of time that the permit was withheld. Whether the delay was short or long the question remains, "Was the delay lawful, or was it unlawful?" See Elsmere Park Club Ltd. Partnership v. Town of Elsmere, 771 F.Supp. 646, 650 (Del.1991) (Town council's *256 stalling of issuance of permit after developer complied with statutory requirements "constituted unlawful delay in violation of substantive due process."); Marathon Oil Co. v. Lujan, 751 F.Supp. 1454, 1464 (Colo.1990) (Where Department of Interior had a duty to issue mineral patents upon mining company's satisfaction of statutory requirements, "[p]laintiffs' rights are effectively denied by Departmental delay."), aff'd. in part, rev'd in part by 937 F.2d 498 (10th Cir.1991); Broward County v. Narco Realty, Inc., 359 So.2d 509, 511 (Fla.Dist.Ct.App.1978) (When developer met all legal requirements for obtaining plat approval "the county had no discretion to refuse...."); Pokoik v. Silsdorf, 40 N.Y.2d 769, 358 N.E.2d 874, 876, 390 N.Y.S.2d 49, 51 (1976) (Where village council delayed issuance of building permit after developer satisfied all statutory criteria, such "`administrative procrastination, calculated to deny a property owner his right to use this land in a currently lawful manner, is supportable neither by law nor by sound and ethical practice.'") (citations omitted).
In the eyes of the law the applicant for a grading permit, like a building permit, is entitled to its immediate issuance upon satisfaction of relevant ordinance criteria and the State Environmental Policy Act of 1971.[13]Juanita Bay Valley Community Ass'n v. City of Kirkland, 9 Wash.App. 59, 84, 510 P.2d 1140 ("[W]e see no rational distinction between building or conditional use permits and a grading permit."), review denied, 83 Wash.2d 1002 (1973); Norco Constr., Inc. v. King County, 97 Wash.2d 680, 684, 649 P.2d 103 (1982) ("Our vested rights rule also has been applied to ... a grading permit...."). Issuance of such a permit is not a matter of discretion but is ministerial. State ex rel. Craven v. City of Tacoma, 63 Wash.2d 23, 27, 385 P.2d 372 (1963) ("[T]he acts called upon by relators to be done when they asked for a building permit under the city zoning regulations and building code were not discretionary but ministerial ... Once [the proposed structure complies with zoning regulations] and the appropriate fee tendered by the applicant, the building department must issue the building permit."); State ex rel. Ogden v. City of Bellevue, 45 Wash.2d 492, 275 P.2d 899 (1954):
A building or use permit must issue as a matter of right upon compliance with the ordinance. 9 Am.Jur. 203, sec. 7. The discretion permissible in zoning matters is that which is exercised in adopting the zone classifications with the terms, standards, and requirements pertinent thereto, all of which must be by general ordinance applicable to all persons alike. The acts of administering a zoning ordinance do not go back to the questions of policy and discretion which were settled at the time of the adoption of the ordinance. Administrative authorities are properly concerned with questions of compliance with the ordinance, not with its wisdom. To subject individuals to questions of policy in administrative matters would be unconstitutional.
Id. at 495, 275 P.2d 899.
The identical legal considerations which govern building and grading permits are especially apparent in the City of Spokane where the municipal code expressly stated as much. SMC 4.03.020 (repealed and superseded by art. 8, ch. 11.02, ord. C-31607 (1996)).
Simply put, neither a grading permit, building permit, nor any other ministerial permit may be withheld at the discretion of a local official to allow time to undertake a further study.[14] The Spokane City Council received well-founded legal advice from its City Attorney which it chose to disregard.
Therefore we have rather a straightforward situation where clear legal rights of the *257 citizen were violated by city council members acting in excess of their lawful authority and by a City Manager acting in excess of his own lawful authority but at the urging of the City Council.
As one lawyer once put it, "What is to be done?"

RCW 64.40
RCW 64.40.020 creates a cause of action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority. A county is an agency for the purpose of this statute. RCW 64.40.010(1); Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 117, 119, 829 P.2d 746 (1992), cert. denied, 506 U.S. 1079, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993). "[C]onclusory action taken without regard to the surrounding facts and circumstances is arbitrary and capricious...." Hayes v. City of Seattle, 131 Wash.2d 706, 717-18, 934 P.2d 1179, 943 P.2d 265 (1997).
The City of Spokane, acting through its City Council and/or its City Manager, arbitrarily refused to process Mission Springs' grading permit application and unlawfully withheld the permit as well. Its action was "`"willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action,'"" id. at 718, 934 P.2d 1179 (quoting Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. 6, 118 Wash.2d 1, 14, 820 P.2d 497 (1991)) (citations omitted), because it acted without lawful authority in unreasoning and willful disregard of the permit applicant's lawful entitlements.

42 U.S.C. sec.1983
A similar result must follow under 42 U.S.C. sec.1983. A prima facie case under 42 U.S.C sec.1983 requires the plaintiff to show that a person, acting under color of state law, deprived the plaintiff of a federal constitutional or state-created property right[15] without due process of law.
Mission Springs had a constitutionally cognizable property right in the grading permit it sought. The right to use and enjoy land is a property right. State ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210, 86 A.L.R. 654 (1928); Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 50, 720 P.2d 782 (1986) ("`Although less than a fee interest, development rights are beyond question a valuable right in property.'") (quoting Louthan v. King County, 94 Wash.2d 422, 428, 617 P.2d 977 (1980)); Ackerman v. Port of Seattle, 55 Wash.2d 400, 409, 348 P.2d 664, 77 A.L.R.2d 1344 (1960) ("`Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal.'" (Citations omitted.)) (quoting Spann v. City of Dallas, 111 Tex. 350, 355, 235 S.W.513, 19 A.L.R. 1387 (1921)).
Moreover, procedural rights respecting permit issuance create property rights when they impose significant substantive restrictions on decision making. Bateson v. Geisse, 857 F.2d 1300, 1304-05 (9th Cir.1988) ("[A] statutory scheme which placed `significant substantive restrictions' on the decision to grant a permit or license would be sufficient to confer due process rights."); Wedges/Ledges of California, Inc. v. City of Phoenix, 24 F.3d 56, 62 (9th Cir.1994) (Procedural permitting requirements may transform a unilateral expectation into a property interest "`if the procedural requirements are intended to be a `significant substantive restriction' on ... decision making.'") (quoting Goodisman v. Lytle,724 F.2d 818, 820 (9th Cir.1984)); Parks v. Watson, 716 F.2d 646 (9th Cir.1983) (same); Jacobson v. Hannifin, 627 F.2d 177, 180 (9th Cir.1980) (property interest is created where discretion to deny the permit or license is limited).
This situation must be analyzed under well-established due process criteria as distinguished from that associated with taking property without just compensation. The Fourteenth Amendment provides "nor shall *258 any state deprive any person of life, liberty, or property without due process of law." By reference through the Fourteenth, the Fifth Amendment distinguishes between deprivations of property for want of due process on the one hand and takings without just compensation on the other. See Fifth Amendment to the United States Constitution ("... nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."). The criteria to establish a taking are "quite different" from that required to establish a deprivation of property for want of due process, and the Supreme Court has instructed there is "no reason" to believe they are the same. Nollan, 483 U.S. at 834 n. 3, 107 S.Ct. at 3147 n. 3.
The talisman of a taking is government action which forces some private persons alone to shoulder affirmative public burdens, "which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); Nollan, 483 U.S. at 835 n. 4, 107 S.Ct. at 3148 n. 4; see also San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 656, 101 S.Ct. 1287, 1306, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting); Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978). The conduct here does not suggest that appropriative governmental action of which the Fifth Amendment Takings Clause speaks but rather rings of deprivation of property through arbitrary interference with that process lawfully due. Certainly it has no similarity to a so-called "private taking" whereby the government attempts to directly, or even indirectly, appropriate private property for private use. Compare, e.g., Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (appropriating landed estates for resale to private parties); In re Petition of Seattle, 96 Wash.2d 616, 638 P.2d 549 (1981) (condemnation of Westlake Mall property for private use improper); Armendariz v. Penman, 75 F.3d 1311 (9th Cir.1996) ("Private takings" claim should be reviewed under Fifth Amendment takings analysis, not Fourteenth Amendment substantive due process analysis.). Thus we follow that overwhelming body of authority which applies Due Process principles to similar factual situations.
A cause of action for deprivation of property without due process is ripe immediately because the harm occurs at the time of the violation as does the cause of action. See Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) ("[T]he constitutional violation actionable under sec.1983 is complete when the wrongful action is taken."); Rutherford v. City of Berkeley, 780 F.2d 1444, 1447 (9th Cir. 1986) (substantive due process violated at moment harm occurs); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 21 n. 11, 829 P.2d 765 (1992) ("[A]n action for a violation of substantive due process is ripe immediately ... because the harm occurs at the time of the violation.") (citing Bateson, 857 F.2d at 1303), cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Cox v. City of Lynnwood, 72 Wash.App. 1, 8, 863 P.2d 578 (1993) (substantive due process is violated at the moment harm occurs).
SMC 4.03.020 permits no delay in the issuance of a building or grading permit while the municipality rethinks plat approval which it had granted years previously. City council members who improperly interfere with the process by which a municipality issues permits deprive the permit applicant of his property absent that process which is due. Bateson, 857 F.2d at 1303; Blanche Rd. Corp. v. Bensalem Township, 57 F.3d 253, 267-68 (3d Cir.) (deliberate and improper interference with the process by which the township issues permit established substantive due process violation even if permits were ultimately issued),cert. denied, 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir.) (improper interference with the process by which municipality issues building permit is arbitrary and violates substantive due process), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); Scott v. Greenville County, 716 F.2d 1409, 1419 (4th Cir.1983) (county council's intervention in administrative issuance process of a building permit violates due process).
*259 Had the City Council repealed the earlier ordinance approving the PUD upon an appropriate finding of changed circumstance, we might have a different situation. But it did not. Nor do we here consider a delay occasioned by foot dragging or inefficiency. Rather this claim puts at issue a purposeful abrogation of mandatory process which would otherwise result in permit issuance.
The City Council's action was the moving force of the constitutional violation, the official policy of the municipality, and the proximate cause of the City Manager's decision to suspend processing of the permit. Compare Bateson, 857 F.2d at 1303 (those who are "the moving force of constitutional violation" are liable under sec.1983). Thus, Mission's claim is properly cast as a civil rights action for precisely the same reasons liability was imposed under 42 U.S.C. sec. 1983 against individual council members under nearly identical, if not less aggravated, circumstances in Bateson.
Bateson v. Geisse, 857 F.2d 1300 (9th Cir. 1988) is the leading and controlling case in this area.[16]Bateson is literally on all fours, if not somewhat less factually aggravated, than what we have here. Bateson, a self-employed builder, submitted a building permit application to the city of Billings, Montana. The application facially complied with building permit ordinance requirements. Nevertheless, the city council initiated a zone change to prevent Bateson from further processing or obtaining his permit to build the proposed project. The Billings City Attorney advised the city council that
if the city act[ed] to deny the building permit or to initiate rezoning to make the proposed project improper or illegal, there [would be a] substantial probability that the Court would overturn that action. There [would also be] a substantial risk that the Court would hold the city liable for damages resulting from delay of the project.
Bateson, 857 F.2d at 1302.
Nevertheless the city council voted to withhold Bateson's building permit notwithstanding satisfaction of all ordinance requirements. Thereupon Bateson, like Mission Springs, commenced suit alleging a cause of action for deprivation of his constitutional rights pursuant to 42 U.S.C. sec.1983, specifically asserting he had been deprived of his property without due process, and, moreover, that his property had been taken without just compensation. The United States District Court held the city council's decision to withhold a building permit violated his right to substantive due process and imposed personal liability on the individual council members. The United States Court of Appeals for the Ninth Circuit affirmed, holding:
As of June 26, 1984, Bateson had met all of the requirements necessary for the City to issue him a building permit. The City of Billings' regulations provide that once an applicant's building plans comply with the code and other applicable laws and the fees are paid, the building official must issue a building permit to the applicant. These regulations do not provide for review by the City Council before a building permit can issue. The City Council voted to withhold Bateson's building permit without providing Bateson with any process, let alone "due"process. This sort of arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, amounts to a violation of that individual's substantive due process rights.
Bateson, 857 F.2d at 1303 (citations omitted). The court went further to note the action of the city council members
caused Bateson's injury because it was "the moving force of the constitutional violation." City of Oklahoma v. Tuttle, 471 U.S. 808, 819-20, 105 S.Ct. 2427, 2434, 85 *260 L.Ed.2d 791 (1985), quoting Polk Co. v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). "[T]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Merritt v. Mackey, 827 F.2d 1368, 1371 (9th Cir.1987), quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978).
Bateson, 857 F.2d at 1303-04. The United States Court of Appeals rejected the city council members' claim of absolute or qualified immunity holding:
The council members acted arbitrarily by denying Bateson's permit when they had no authority to withhold it. At the time they acted, the law was established sufficiently to make their conduct unreasonable. It was established so well, in fact, that City Attorney Tillotson warned them that if they acted to deny the building permit or to initiate rezoning to make the proposed project improper or illegal, there was a substantial probability that a court would overturn that action and hold them liable for the resulting damages due to the project's delay. The council members ignored clearly established law and their attorney's advice. They are not shielded from personal liability.
Bateson, 857 F.2d at 1305. Similar facts and identical law mandate the same result. Federal precedent controls our application of federal law. Sintra, 131 Wash.2d at 652, 935 P.2d 555. As in Bateson claims of absolute immunity should be denied and defendants' liability pursuant to 42 U.S.C. sec.1983 established.
Municipal liability for section 1983 purposes attaches when he municipality acts through official policy. Monell v. Department of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). An act undertaken by a municipal legislative body is an act of the municipality. Pembaur v. City of Cincinnati 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Spokane acted by and through official policy when its City Council passed the subject motion. Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 118, 119, 124, 829 P.2d 746 (1992), cert. denied, 506 U.S. 1079, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993). This act was not only that of the individuals, it was the act of the municipality as well. Municipalities enjoy no qualified immunity from suit. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); Robinson v. City of Seattle, 119 Wash.2d 34, 64, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Lutheran Day Care, 119 Wash.2d at 118, 829 P.2d 746.

Legislative Immunity
However, members of the City Council assert absolute legislative immunity on their own behalf. Notwithstanding, such claims of absolute legislative immunity must be rejected here for the same reason like-claims were rejected under similar circumstances in Bateson. "The Supreme Court `has generally been quite sparing in its recognition of claims to absolute official immunity.'" Chateaubriand v. Gaspard, 97 F.3d 1218, 1220 (9th Cir.1996) (quoting Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988)). "The burden of proof in establishing absolute immunity is on the individual asserting it." Trevino v. Gates, 23 F.3d 1480, 1482 (9th Cir.), cert. denied, 513 U.S. 932, 115 S.Ct. 327, 130 L.Ed.2d 286 (1994).
Although a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity. Rather, "[w]hether actions ... are, in law and fact, an exercise of legislative power depends not on their form but upon `whether they contain matter which isproperly to be regarded as legislative in its character and effect.'" Cinevision Corp. v. City of Burbank, 745 F.2d 560, 580 (9th Cir.1984) (quoting I.N.S. v. Chadha, 462 U.S. 919, 952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983)), cert. denied, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). Therefore we must look to "the nature of the function performed, not the identity of the actor who performed it," Forrester, 484 U.S. at 229, 108 S.Ct. at 545, when *261 determining whether or not legislative immunity is available. "`[A]n act which applies generally to the community is a legislative one, while an act directed at one or a few individuals is an executive one.'" Trevino, 23 F.3d at 1482 (quoting Bateson, 857 F.2d at 1304 (quoting Cinevision, 745 F.2d at 579)). See Durocher v. King County, 80 Wash.2d 139, 152-53, 492 P.2d 547 (1972) ("Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative."). The motion passed by the Spokane City Council was not legislation generally applicable to the entire community but rather an act directed specifically at Mission. It was administrative or executive in nature,[17] not legislative, and therefore legislative immunity is not available here any more than it was under the comparable situation in Bateson. Compare Acierno v. Cloutier, 40 F.3d 597, 612-15 (3d Cir.1994) (no legislative immunity for enacting ordinance that voided approved recorded development plan because action was administrative in nature).
The trial court also erred when it dismissed Mission's claims on the merits. Arbitrary or irrational refusal or interference with processing a land use permit violates substantive due process. Bateson, 857 F.2d at 1304; Robinson, 119 Wash.2d at 64, 830 P.2d 318; Sintra, 119 Wash.2d at 21, 829 P.2d 765; R/L Assocs., Inc. v. City of Seattle, 113 Wash.2d 402, 412, 780 P.2d 838 (1989); Blanche Rd. Corp. v. Bensalem Township, 57 F.3d 253, 267-68 (3d Cir.), cert. denied, 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); Bello v. Walker, 840 F.2d 1124, 1129-30 (3d Cir.), cert. denied, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988).
"Irrational" has been defined as "[u]nreasonable, foolish, illogical, absurd...." Black's Law Dictionary 829 (6th ed.1990). The actions of the City Council were at least two steps removed from that reason which is required. First, the council interjected itself into the administrative process reserved to the City Manager notwithstanding clear and unequivocal charter mandate to the contrary. See Spokane City Charter, art. IV, sec. 22 "Administrative Branch." Second, council members and the City Manager rejected lawful, mandatory requirements for the processing and issuance of grading permits codified in state statute and local ordinance without reasonably tenable lawful justification. Although the irrationality is objectively established by the departure from the mandatory legal process, we note the irrationality is further dramatized by the overt rejection of advice from the City's own attorney in favor of a defiant course of action well summarized by the comment:
We have the opportunity to put a stop to this and let's just see what happens. Let's see how confident they are. If they bring suit, we can always turn around and issue the permit, that's an option still available to us.
CP at 94. Such was certainly not the process due Mission Springs.
Defendants claim no constitutional deprivation occurred because the permit was ultimately issued. Damage questions are normally determined by the fact finder; however, if plaintiffs prove the elements of a section 1983 action, they are entitled to at least nominal damages for deprivation of their constitutional rights. Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978); Kalmas v. Wagner, 133 Wash.2d 210, 943 P.2d 1369, 1371 (1997). "[T]he amount of damages plaintiffs may be entitled to is a separate issue from whether defendants' conduct was arbitrary or unreasonable and therefore violative of due process." Zaintz v. City of Albuquerque, 739 *262 F.Supp. 1462, 1470 n. 13 (D.N.M.1990). See also, e.g., Hirschfeld v. Spanakos, 871 F.Supp. 190, 195 (S.D.N.Y.1994) (proof of actual damages irrelevant to establish section 1983 liability).

Conclusion
Mission Springs was entitled to regular administrative processing and issuance of the requested grading permit in accordance with ordinance criteria. The Spokane City Council, contrary to the advice of its own city attorney, deprived the permit applicant of that process lawfully due by instructing its city manager to withhold the permit for reasons extraneous to ordinance, or lawful, criteria. The City Manager did in fact suspend the required process and acceded to the City Council's demand to withhold the permit without lawful justification, thereby depriving Mission Springs of its property absent the lawful process due under the laws of this State and the ordinances of Spokane. The duration of the deprivation, and the ultimate issuance of the permit after suit had been commenced, does not change the fact that the legal rights of Mission Springs were violated in the first instance.
The trial court's summary judgment of dismissal is reversed, and the case is remanded for trial consistent with this opinion. Appellants shall recover appellate costs and reasonable attorney fees pursuant to 42 U.S.C. sec.1988 and RCW 64.40.020.
DURHAM, DOLLIVER, SMITH, MADSEN and ALEXANDER, JJ., concur.
TALMADGE, Justice (dissenting).
The majority, in effect, finds a constitutional tort because the City of Spokane (City) delayed processing a grading permit for a few weeks due to ostensible worries regarding legitimate public health and safety issues associated with the Mission Springs project. The majority selectively addresses the facts and manipulates the law to achieve its result. I dissent.

FACTS
Mission Springs sought to build a 790-unit apartment project in Spokane as a planned unit development (PUD). The project was "the largest proposed planned unit development in Spokane County" at the time. Clardy v. Cowles Publ'g Co., 81 Wash.App. 53, 64-65, 912 P.2d 1078 (1996). The principal access to the project was Thorpe Road, which before reaching the project site proceeded through two narrow tunnels under railroad tracks constructed in the early 1900's.
Despite public opposition to the project, the Spokane City Council in 1992 enacted an ordinance rezoning Mission Springs' parcel and approving its plat and PUD designation for the project. The Council's actions were based in part on information from a 1991 traffic study on the effect of the project on Thorpe Road traffic. Mission Springs obtained grading and building permits for the project by early 1993.
Mission Springs failed to use the permits, however, and, despite extensions, allowed them to lapse. The City declared them abandoned for nonuse in May 1994.
Five months later, in October 1994, Mission Springs applied for a new grading permit, but not a building permit.[1] Spokane's Director of Building Services (Building Official) determined the permit application was incomplete and asked Mission Springs to supply (1) an updated traffic study; (2) evidence of formation of a homeowners association; (3) a geotechnical report and investigation; (4) documentation of special inspection services; and (5) grading specifications.[2] Mission *263 Springs has never challenged the propriety of the imposition of these conditions, or the delay they engendered in the permitting process. The City asked Mission Springs for an updated traffic study on August 8, 1994, and again on November 3, 1994, but no study was provided. Although Mission Springs did supply a letter from an engineering firm containing traffic counts in February 1995, Spokane's Building Official did not consider this letter to be an update of the 1991 traffic study (apparently because it did not contain projections of traffic).[3]
Subsequent to the 1991 traffic study, Spokane County approved a 102-unit project at Lindell Court, which was also served by Thorpe Road. Traffic on Thorpe Road increased 30 percent between 1991 and 1994, about 12 percent more than was projected in Mission Springs' 1991 traffic study. Serious traffic accidents also occurred in the Thorpe Road tunnels.
On June 22, 1995, at a regularly scheduled City Council briefing session, traffic concerns with the Mission Springs PUD arose. At issue were safety problems stemming from the two traffic tunnels. Councilmembers expressed concern as to whether traffic conditions had changed since approval of the PUD in 1992, and discussed ordering a traffic study to determine whether there was now a safety hazard to the public using the tunnels. At the outset of discussion of the Mission Springs project, the City's development director, in answer to the mayor's question about the status of the project, said: "We are ready to issue the grading permit. The legal department has reviewed the process. We have completely gone through it and we're ready to issue the grading permit." Clerk's Papers at 75. The mayor and Councilmember Holmes expressed concern about the tunnels on Thorpe Road. The Building Official responded that the tunnels are a deficiency of Spokane's transportation network and "not a deficiency caused by Mission Springs or any other development out there or enhanced by Mission Springs or detracted by Mission Springs or any other development out there.... And the tunnels are adequate to service the traffic that will be generated from the project." Clerk's Papers at 80-81.
The Council took testimony at the briefing session and, based on that testimony and the councilmembers' own knowledge of increased traffic, passed a motion ordering a new traffic study by the City. The motion also purported to suspend the issuance of the grading permit pending the results of the study. The City Attorney, at the open meeting and on the record, warned the Council of the possibility of a lawsuit arising out of any action to stop the issuance of a permit, but the Council did not take the advice of the City Attorney and passed the motion unanimously. Councilmember Anderson averred later that he voted for the study because he was aware of additional traffic in the area from a new, nearby apartment complex that had not been forecast in the original 1991 traffic study. He felt the existing traffic study was outdated. Councilmember Holmes also had the new apartment complex in mind when she voted for the new study.
The City Manager ordered a temporary suspension of the processing of the grading permit. The traffic study was completed and presented to the Council on August 14, 1995, just six weeks later. The report showed traffic concerns about the Mission Springs project were unwarranted, and the City Manager then ordered the Building Official to resume processing the grading application. Processing was further delayed, however, by *264 the necessity for resolving an adverse possession claim to one of the lots in the Mission Springs plat. According to City Manager Roger D. Crum:
[L]andowners adjacent to the Mission Springs plat [the DeBills] were claiming title by adverse possession to a strip of land in the Mission Springs plat. One of the issues in the case was the potential invalidity of the plat because of the adverseinterest. Because I believed there would always be a question as to the legal validity of the [plat], and because the developer still had not complied with the requirements for issuance of his grading permit, I directed the Planning Department to place a"hold" on the final grading permit issuance until the plat validity issue was resolved. The plat issue was resolved and the"hold" lifted before the developer had complied with the requirements for a grading permit.
Clerk's Papers at 292.[4] In its first amended answer to Mission Springs' complaint, Spokane alleged the Mission Springs plat approval was illegal ab initio because it did not contain the signatures of all the owners of the plat pursuant to RCW 58.17.165.[5] The DeBills' signatures were not on the plat. Apparently, as a result of this problem with plat ownership, Building Official Bob Eugene informed Richard Vandervert, Mission Springs' agent, by letter of August 24, 1995:
This is to advise you that the City of Spokane Construction Services Department is presently constrained from issuing a grading permit for the [Mission Springs] project.
The constraint arises from a third party claim of adverse possession of a portion of the proposed development site. The City has been given official notice of this claim, and is undertaking a legal investigation into the ramifications of this action in relation to plat approvals.
Clerk's Papers at 108.
The adverse possession dispute was settled, and voluntary dismissal of the lawsuit occurred on October 6, 1995. Thereafter, according to Mission's representative, Dan Clardy: "As soon as agreement was reached on the resolution of the DeBill Lawsuit in October we completed the final details required by the City including the filing of the lot line adjustment information with Spokane County. This could not be done until late in October when the documents were finally received from the City of Spokane." Clerk's Papers at 503.[6] Subsequently, Mission Springs submitted the information required for a complete application and Spokane issued the permit on November 3, 1995.
Meanwhile, Mission Springs had filed a complaint against the City, its councilmembers, and the city manager on July 3, 1995, seeking money damages and injunctive relief. Mission Springs alleges as the gravamen of its complaint that the defendants, at a City Council meeting on June 22, 1995, "passed a resolution prohibiting the issuance of any permits until a new report on traffic was brought forward and reviewed by the Council." *265 Clerk's Papers at 43. The majority agrees: the wicked act of the City occurred on June 22, 1995, when the City "abrogated Mission Springs' right to obtain issuance of a grading permit when the City Council acted to deny issuance of this or any permit and the City Manager acquiesced in the council's demands." Majority op. at 255-256.
The councilmembers filed a CR 12(b)(6) motion to dismiss. Mission Springs cross-moved for summary judgment, seeking dismissal of the councilmembers' legislative immunity defense, and requesting injunctive relief. The trial court denied Mission Springs' motions, and granted summary judgment to the councilmembers, dismissing the suit. The trial court noted:
Summary judgment is properly granted in this action as a matter of law because plaintiffs have failed to come forward with evidence that the defendants acted in violation of RCW. 58.17.170 or RCW ch. 60.64[sic] or 49[sic] U.S.C. sec.1983. No genuine issues of material fact exist that the defendants performed a reasonable investigation regarding issues pertaining to changed conditions of traffic safety and the public health and safety. Because defendants' actions constituted appropriate legislative function in accordance with RCW 58.17.170, the individual defendants are immune from liability to the plaintiffs. In addition, the evidence is undisputed that plaintiffs failed toperfect the application for a Grading Permit for the Mission Springs project by failing to pay the necessary fees and failing to supply other required information to constitute a completed permit application prior to October 30, 1995. As a matter of law, plaintiffs failed to obtain any vested right to the issuance of a Grading Permit prior to October 30, 1995, when the fees were paid and the application for Grading Permits made complete.
Clerk's Papers at 548-49. Mission Springs sought, and we granted, direct review.
The majority opinion asserts the cause of action in this case is "wrongful refusal to process a grading permit." It states: "The ultimate issue is whether a municipality may withhold a ministerial land use permit for reasons extraneous to the satisfaction of lawful ordinance and/or statutory criteria." Majority op. at 253.[7] Because the City did in fact process the grading permit, and did not in fact withhold it, and did permit Mission Springs to pursue its development project according to its unchanged subdivision plat, I have difficulty following the majority's "rationale." Exactly what is Mission Springs complaining about, and exactly what behavior does the majority consider so outrageous that it finds the City and its councilmembers committed a constitutional tort?

ANALYSIS
The majority ignores crucial facts. Mission Springs applied for the grading permit on October 13, 1994. The City responded to the application on November 3, 1994, by asking Mission Springs for an updated traffic study. Mission Springs did not then file a lawsuit complaining of illegal delay by the City. Nor did it file a lawsuit complaining of illegal delay in December, January, February, March, April, May, or June. In fact, a total of eight months and nine days passed from the time Mission Springs applied for a grading permit until the City Council meeting of June 22, 1995, all without complaint from Mission Springs about delay. Nor do we hear the majority opinion remonstrating about "deprivation of property without due process" for those eight months and nine days, even though the majority asserts a cause of action for the harm Mission Springs complains of arose "at the time of the violation."
What, then, happened at the Spokane City Council meeting on June 22, 1995, that, in the majority's mind, justifies bringing to bear on the City the full wrath of the Ku Klux Act *266 of 1871 (42 U.S.C. sec. 1983)? What occurred at that meeting that had not happened in the previous eight months and nine days of non-issuance of the grading permit?
What happened, of course, is that City councilmembers asked for a traffic study prior to issuance of the grading permit, and the city attorney told them by doing so, they may be liable. Mission Springs and the majority attribute no fault to the City's November 1994 request for a traffic study. It is only the June 1995 request for a traffic study the majority finds constitutionally repugnant, and apparently only because the city attorney said then that it was.[8] No law I know of provides relief for such a contrived set of facts.
A. The Meaning of RCW 58.17.170
The problem before us is one of statutory construction. We must give meaning to RCW 58.17.170, which provides, in pertinent part:
When the legislative body of the city, town or county finds that the subdivision proposed for final plat approval conforms toall terms of the preliminary plat approval, and that said subdivision meets the requirements of this chapter, other applicable state laws, and any local ordinances adopted under this chapter which were in effect at the time of preliminary plat approval, it shall suitably inscribe and execute its written approval on the face of the plat.... Any lots in a final plat filed for record shall be a valid land use notwithstanding any change in zoning laws for a period of five years from the date of filing. A subdivision shall be governed by the terms of approval of the final plat, and the statutes, ordinances, and regulations in effect at the time of approval under RCW 58.17.150(1) and (3)for a period of five years after final plat approval unless the legislative body finds that a change in conditions creates aserious threat to the public health or safety in the subdivision. (Emphasis added.) The italicized language is the key to this case. The language addresses preservation of public health and safety, not land use policy. The statute codifies in the context of subdivision regulation what has been settled Washington law since 1905: vested rights must yield to public health and safety considerations.
And there is no merit in the contention that the respondent had any inherent or vested right because he had complied with the law existing at the time he built. There is no such thing as an inherent or vested right to imperil the health or impair the safety of the community. But to be protected against such impairment or imperilment is the universally recognized right of the community in all civilized governmentsa protection which the government not only has a right to vouchsafe to the citizens, but which it is its duty to extend in the exercise of its police power.
City of Seattle v. Hinckley, 40 Wash. 468, 471, 82 P. 747 (1905) (Dunbar, J.) (cited in Hass v. City of Kirkland, 78 Wash.2d 929, 931-32, 481 P.2d 9 (1971)); West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 53, 720 P.2d 782 (1986) ("Municipalities can regulate or even extinguish vested rights by exercising the police power reasonably and in furtherance of a legitimate public goal."); see also Erickson & Assocs., Inc. v. McLerran, 123 Wash.2d 864, 873, 872 P.2d 1090 (1994) ("vested rights doctrine is not a blanket rule requiring cities and towns to process all permit applications according to the rules in place at the outset of the permit review").
The statute at issue here speaks to public health and safety. This is not a case where a city has attempted to pull the rug out from under a developer by changing land use policies in midstream. RCW 58.17.170 would, in fact, have been a bulwark against such an eventuality. According to the statute, no intervening change in zoning or land use ordinances could have divested Mission Springs of the right to develop its property in accordance with the ordinances in place at the time the City approved the subdivision.
If, however, the City "finds that a change in conditions creates a serious threat to the *267 public health or safety in the subdivision," then the Mission Springs subdivision may be divested of the right to "be governed by the terms of approval of the final plat, and the statutes, ordinances, and regulations in effect at the time of approval" of that subdivision. Plainly, if traffic conditions had worsened significantly in the four years since the Mission Springs subdivision had been approved, so that palpable threats to public safety would result from building the apartment complex, the City would have the power under the statute to change the subdivision by ordinance because of "a change in conditions creat[ing] a serious threat to the public health or safety in the subdivision."[9]
Well-founded public health concerns always trump vested development rights. The Legislature in RCW 58.17.170 gave developers full rights to develop their subdivisions for five years in accordance with existing laws, with the single exception that should a threat to public health or safety arise in those five years, those development rights are defeasible. The Legislature declined to subordinate public health or safety concerns to property development interests. The law has never been and could hardly be otherwise in a rational society.
The majority agrees, as it must, that the City, after processing and issuing the permit, could at any time thereafter have made a finding of changed conditions and passed an ordinance amending the plat to reflect those changed conditions. Majority op. at 256 n. 14. Thus, in consonance with our long-established law, the majority agrees public health or safety concerns may supersede vested rights to development. The majority holds, however, that while the City had a perfect right to amend or even cancel the entire plat after finding changed conditions, it had no right to delay issuing a grading permit to investigate whether conditions had changed. In other words, Mission Springs had no absolute, constitutional right to develop its subdivision in the face of detriments to public health or safety, but it did have an absolute, constitutional right to obtain a grading permit without a reasonable delay for the City to investigate whether public health and safety detriments were present. Accordig to the majority, the City could deny, but it could not delay.
I have concern for our credibility when we announce such impractical rules of law. We do not abandon our common sense when we come through the door of the Temple of Justice. Our task here is to interpret RCW 58.17.170 in a way that addresses practical realities. Recently, we repeated the well-established rule that we will not interpret statutes so as to produce absurd results, Double D Hop Ranch v. Sanchez, 133 Wash.2d 793, 947 P.2d 727, 952 P.2d 590 (1997), a rule we first stated in territorial days. Spokane Mfg. & Lumber Co. v. McChesney, 1 Wash. 609, 610, 21 P. 198 (1889). The majority's analysis produces an absurd result.[10]
A sensible way to read the statute is to recognize that the subdivision proponent is entitled to proceed with development in accordance with the ordinances and regulations in place at the time of subdivision approval, provided there has been no change in conditions affecting public health or safety. Numerous eventualities can, and do, occur in the real world. A municipality should be allowed to investigate whether changed conditions have occurred. RCW 58.17.170 certainly does not forbid the municipality a reasonably short time to conduct such an investigation.
The alternative to the majority's view is a rule of reason. Pursuant to RCW 58.17.170, which does not speak to grading permits, development of an approved subdivision is always contingent upon the absence of a threat to health or safety. The governing authority always has the power to make a determination about changes in conditions *268 creating threats to public health or safety in the furtherance of its general police powers, regardless of when or whether the subdivision developer has applied for any permits. This power to provide for public health or safety is not subject to time bars; it makes no difference when Mission Springs submitted its grading permit. Spokane always had the power either to deny it or to delay it, in keeping with its charge to maintain public health and safety.[11]
Of course, the subtext in this case is the unstated assertion that the City ordered the delay on June 22 only as a pretense to stop the politically unpopular Mission Springs development. The majority quotes the City Council's deliberations at length in a attempt to make that very point. However, "[w]e are not permitted to inquire into the motives of the city council. If the ordinance is valid on its face, the reasons or arguments that may have moved the city council to act are not pertinent here." Shepard v. City of Seattle, 59 Wash. 363, 375, 109 P. 1067 (1910). We most recently reiterated this principle in Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 129, 937 P.2d 154, 943 P.2d 1358 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998), where we said: "[A] court should not strike down an otherwise constitutional statute on the assumption that the legislative body had a wrongful purpose." Justice Frankfurter wrote in Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951), "The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130[, 10 U.S. 87, 3 L.Ed. 162 (1810) ], that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned." See also McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78 (1904).
Likewise in this case, we ought not make bad law simply because we discern the City of Spokane had ulterior, political motives in delaying the grading permit.[12] The only legitimate focus of our inquiry is whether, under the circumstances existing on June 22, 1995, there was any justification for delaying the grading permit in order to conduct a new traffic study in the City's exercise of its responsibility to protect public health and safety.
The answer is quite plainly yes. The prior traffic study was years old, and new development had taken place in the vicinity of the Mission Springs subdivision. Two councilmembers averred in affidavits they were concerned about increased traffic from the new development. The traffic information Mission Springs had submitted in February 1995 was simply a traffic count, and did not constitute a true traffic study. That the City Council disagreed with its staff on the question does not mean the request for a traffic study lacked justification. The City Council bears the ultimate responsibility for public health and safety, not the City staff.
B. Constitutional Law Analysis
I doubt federalconstitutional law is implicated here in the first instance. At worst, the City violated RCW 58.17.170 by its delay *269 in issuing the grading permit.[13] As we stated in Orion Corp. v. State, 109 Wash.2d 621, 652, 747 P.2d 1062 (1987), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988), "If our state constitution provides the protection sought, a federal question under the Fourteenth Amendment's due process clause does not arise."[14] We ought not make a federal case out of it every time somebody disagrees with a local land use decision. Our state constitution does not contain lesser guarantees of due process than the federal constitution. Moreover, RCW 64.40 provides an adequate and speedy remedy for Mission Springs' claims in this case.
Although I do not believe the City is liable, it is necessary to address several misconceptions in the majority opinion. We have laboriously and sometimes tortuously worked out our land use constitutional jurisprudence over the last decade, from Orion through Presbytery of Seattle v. King County, 114 Wash.2d 320, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990), to Sintra, Inc. v. City of Seattle, 131 Wash.2d 640, 935 P.2d 555 (1997), with many stops enroute. It is, therefore, with great astonishment that I find the majority's discussion of the constitutional issues practically devoid of reference to the teachings of those cases. It is as if there were no existing Washington law on the subject.
1. Substantive Due Process[15]
For instance, the majority concludes a violation of substantive due process occurred in *270 this case without defining what constitutes a violation of substantive due process in Washington. All the majority says is that the conduct of the City "rings of deprivation of property through arbitrary interference with that process lawfully due." Majority op. at 258. Defining substantive due process as "that process lawfully due" is, of course, a tautology, but a most pliable and convenient one. I prefer the view that this Court's primary function is to state the law with as much specificity and precision as our analytical faculties and writing skills allow, so that the citizens of Washington will have sure and certain legal guidelines to which to conform their behavior.
More to the point, however, is that the majority simply ignores our cases defining substantive due process:
To determine if a regulation results in a denial of due process, the court engages in a balancing test. We ask: "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner."

Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 21, 829 P.2d 765 (1992) (quoting Presbytery, 114 Wash.2d at 330, 787 P.2d 907 and Orion, 109 Wash.2d at 646-47, 747 P.2d 1062).[16] We have most recently stated our adherence to this definition in Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 660, 946 P.2d 768 (1997).
I would subject the facts of this case to our three-pronged test. The regulation at issue is the resolution passed by the City Council to initiate a new traffic study and to delay issuance of the grading permit. Under the first prong, the City's action was obviously aimed at achieving a legitimate public purposethe preservation of public safety. Under the second prong, whether the ensuing delay was unreasonable is a mixed question of fact and law. I would hold under the undisputed facts of this case that the six-week delay was not unreasonable, especially insofar as it came after more than eight months of delay Mission Springs does not complain about. Under the third prong, a determination of whether the resolution was unduly oppressive depends on a list of nonexclusive factors the Court has adopted from a law review article by Professor Stoebuck. Sintra, 119 Wash.2d at 22, 829 P.2d 765. Of that list, the relevant factors are the nature of the public harm and the seriousness of the problem, balanced against the expense to Mission Springs. Mission Springs does not claim damages for the eight-month delay, but does claim $1,000,000 in damages for the six-week delay. The rationale for the damage claim is not in the record on appeal. I would hold as a matter of law the seriousness of the traffic impacts from the Mission Springs development, *271 given the known dangers of travel on Thorpe Road, justified the short delay for the City to obtain a new traffic study. In summary, using this Court's test for substantive due process, I would find no violation here.
The majority opinion claims to "follow that overwhelming body of authority which applies Due Process principles to similar factual situations," Majority op. at 258, but fails to cite the location of even a small portion of "that overwhelming body." As noted above, substantive due process as a cause of action in cases like the one at bar is a thing of the past in the Ninth Circuit. Moreover, as I have indicated previously, substantive due process claims are extremely difficult to sustain in the other federal circuit courts as well. Sintra, 131 Wash.2d at 684 n. 3, 935 P.2d 555 (Talmadge, J., concurring in part, dissenting in part).
Lost in a legal universe where a substantive due process remedy generally does not exist for Mission Springs' claims, and strangely unwilling to apply Washington substantive due process law, the majority latches onto a case from the Court of Appeals for the Third Circuit. Citing Blanche Rd. Corp. v. Bensalem Township, 57 F.3d 253, 267-68 (3d Cir.), cert. denied, 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995), for the proposition that deliberate and improper interference with the process by which a township issues a permit establishes a substantive due process violation, the majority concludes, "City council members who improperly interfere with the process by which a municipality issues permits deprive the permit applicant of his property absent that process which is due." Majority op. at 258. There are two points to make about this.
First, the majority relies on the Third Circuit's definition for a substantive due process violation. In order to demonstrate a violation of substantive due process in the Court of Appeals for the Third Circuit, one must show either that (1) the agency's actions were not rationally related to a legitimate government interest, or (2) the agency's actions were motivated by bias, bad faith, or improper motive. Blanche Rd., 57 F.3d at 262. These may be perfectly acceptable grounds for finding a substantive due process violation in Pennsylvania, New Jersey, and Delaware, but they are not the grounds we have established in Washington.
Second, the majority opinion cites Bateson v. Geisse, 857 F.2d 1300, 1303 (9th Cir.1988), as support for the proposition that city council members who interfere with the proper issuance of permits "deprive the permit applicant of his property absent that process which is due." Majority op. at 258. The cited discussion in Bateson concerns substantive due process. Bateson is a Ninth Circuit case. Armendariz abolished substantive due process in the Ninth Circuit. Bateson is therefore no longer authority for the existence of a substantive due process violation. The majority's citation of Bateson is inappropriate and incorrect.[17]
In summary, the majority inexplicably ignores Washington law on substantive due process, and without even explaining what criteria it relies on to find a violation here, imports law from a foreign federal circuit court of appeals and substitutes it for Washington's law. While the majority and I might still disagree on the outcome of this case were it to apply Washington law as I have done above, I cannot understand why the majority would so facilely abandon our precedents and established analytical protocols. "Stare decisis requires `[o]nce this court has decided an issue of state law, that interpretation is binding until we overrule it.'" State v. Hamlet, 133 Wash.2d 314, 329 n. 3, 944 P.2d 1026 (1997) (Sanders, J., dissenting) (quoting Hamilton v. Department of Labor & *272 Indus., 111 Wash.2d 569, 571, 761 P.2d 618 (1988)).
2. 42 U.S.C. sec.1983
"There are only two essential elements in a sec.1983 action: (1) the plaintiff must show that some person deprived it of a federal constitutional or statutory right; and (2) that person must have been acting under color of state law." Sintra, 119 Wash.2d at 11, 829 P.2d 765. Although the majority acknowledges property rights stem from state law, not constitutional law, it fails to identify precisely what right Mission Springs was deprived of here. The majority refers to the general right to use and enjoy land, but that does not get us very far because it says nothing about whether Mission Springs had a constitutional right to a grading permit on demand, as the majority insists it did. Absent an approved subdivision plat, Mission Springs' general right to use and enjoy its land did not include a grading permit.
As we said in Smith v. Greene, 86 Wash.2d 363, 366, 545 P.2d 550 (1976) (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)), "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state lawrules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Thus, we must analyze whether state law granted Mission Springs a right the City unconstitutionally deprived it of. The language of RCW 58.17.170 is the key.
The statute says, "A subdivision shall be governed by the terms of approval of the final plat, and the statutes, ordinances, and regulations in effect at the time of approval... for a period of five years after final plat approval unless the legislative body finds that a change in conditions creates a serious threat to the public health or safety in the subdivision." The statute simply vests the "statutes, ordinances, and regulations" in effect at the time of plat approval as the governing regulations for development of the plat for the next five years, with the proviso that no changes creating a serious threat to health or safety arise. As we explained in West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 51, 720 P.2d 782 (1986), the "purpose of the vesting doctrine is to allow developers to determine, or `fix,' the rules that will govern their land development."
Basing their approach on language from Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), numerous courts have found a constitutionally cognizable property right in a "legitimate claim of entitlement" to and a "justifiable expectation" of a desired land use action. When the agency must exercise its discretion, however, there is no "legitimate claim of entitlement" or "justifiable expectation." Silver v. Franklin Township, 966 F.2d 1031, 1036 (6th Cir. 1992) (no property right in conditional zoning certificate because issuing agency had broad discretion). Here, it is evident from the language of RCW 58.17.170 Mission Springs had a "legitimate claim of entitlement" to and a "justifiable expectation" of developing its subdivision in accordance with the statutes, ordinances, and regulations in effect at the time of plat approval, so long as there had been no change creating serious threats to public health or safety.
Mission Springs therefore had a right to a grading permit issued under whatever rules and regulations governed grading in the City of Spokane at the time of plat approval. All of this says nothing, however, about whether the City could institute a reasonable delay in the issuance of that permit to investigate changed conditions. The delay that occurred in this case did not result in the imposition of different rules and regulations than Mission Springs was entitled to under the vesting RCW 58.17.170 provided. Therefore, the delay deprived Mission Springs of no cognizable, state-created rights, and a cause of action under 42 U.S.C. sec.1983 does not he.
The fallacy in the majority's reasoning is its failure to identify with precision the state-created right at issue in this case. The right was not to the issuance of a grading permit per se, but to the issuance of a grading permit governed by the statutes, ordinances, and regulations in effect at the time of plat approval. That is all RCW 58.17.170 requires. *273 Nothing in the plain language of the statute creates a right to issuance of a permit on demand. The majority erroneously equates delay with denial.[18]
C. Legislative Immunity
1. No Executive Powers
The majority finds the Spokane City Council members individually liable. This is simply wrong, not just as a matter of legislative immunity, but because the action of the City Councilmembers had no legal force or effect. As the majority itself points out in its footnote 16, the City Council in Spokane, which has a council-manager form of government, has no executive powers whatsoever. Unlike cities with which most people are familiar, where the mayor is the chief executive officer, in a council-manager city like Spokane, the unelected City Manager is the chief executive officer, and "[N]either the city council nor any member thereof shall give orders to any subordinate of the city under the jurisdiction of the city manager." Spokane City Charter, art. IV, sec. 22(b).[19]In effect, the city council in a council-manager government is like a board of directors. The only legal authority it has is to make policy (to legislate), and to hire the City Manager.
The City Manager ordered the delay in issuing the permit on his own authority. He was not legally obliged to follow City Council direction in the carrying out of city administrative duties.[20] The portion of the City Council motion imposing the delay was a nullity. Thus, because the City Council and its members lacked the legal authority to give orders to city administrators to halt the issuing of the grading permit, any such order was without legal force or effect. In such administrative matters, the city council of a council-manager government has no more legal authority than an ordinary citizen. The City Councilmembers therefore cannot possibly be liable for issuing an order that was void at its birth.
The majority admits ordering the building official to delay the permit was an "administrative process reserved to the City Manager [by] clear and unequivocal charter mandate." Majority op. at 261. Precisely because the city charter did not extend power to the City Council to do what it purported to do, the Council's action was futile and ineffective; nevertheless, the majority holds that action violated federal law. If city councilmembers may be liable for things they say regarding public policy while sitting in their official capacities, grave constitutional concerns arise.
2. Absolute Legislative Immunity
Article I, section 6 of the federal constitution provides, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." Article I, section 17 of the state constitution contains a similar provision: "No member of the legislature shall be liable in any civil action or criminal prosecution whatever, for words spoken in debate." These provisions reflect a centuries-long tradition of legislative immunity in both English and American law. Tenney, 341 U.S. at 373, 377, 71 S.Ct. at 786, 788; Forrester v. White, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). See also Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 107, 829 P.2d 746 (1992) (policy rationale for quasijudicial immunity), cert. denied, 506 U.S. 1079, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993).
Recently, in Bogan v. Scott-Harris, ___ U.S. ___, 118 S.Ct. 966, 140 L.Ed.2d 79 *274 (1998), the United States Supreme Court affirmed the holdings of numerous lower courts and extended absolute legislative immunity under 42 U.S.C. sec.1983 to local legislators like the councilmembers here. The policy reasons for absolute legislative immunity seem clear enough. The scope of that immunity may even be surprising. For instance, in Chappell v. Robbins, 73 F.3d 918 (9th Cir.1996), the court considered a claim against a California state senator who took bribes from the president of an insurance company while serving as Chairman of the Senate Insurance Committee from 1978 to 1985. After receiving the bribes, Robbins sponsored bills to strip the Insurance Commissioner of the power to regulate credit insurance and to repeal certain new Insurance Commissioner regulations. Id. at 920. Chappell sued Robbins in his personal capacity under the federal civil RICO (Racketeering Influenced and Corrupt Organization Act) law. Robbins moved to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, asserting he was entitled to absolute legislative immunity. The Court of Appeals for the Ninth Circuit agreed with Robbins, holding his "efforts in sponsoring and pushing for passage of legislation concerning statewide insurance regulation fall squarely within the class of legislative acts.... `The claim of an unworthy purpose does not destroy the privilege.'" Id. at 921 (quoting Tenney, 341 U.S. at 377, 71 S.Ct. at 788).
This decision is plainly correct if absolute legislative immunity and the policy reasons supporting it are to have any currency. Even if one believes that thwarting the will of land developers is a more depraved and villainous thing for a public official to do than accepting bribes from insurance companies, absolute legislative immunity must apply in the present case. Aside from departing from the tradition of hundreds of years of English and American law, allowing the personal assets of Washington's local elected officials to be put at risk for what happened in this case will have devastating consequences on the willingness of community-minded, public-spirited citizens to serve in elected office. The majority here makes extraordinarily bad public policy.[21]
The dispositive question here is whether what the City Council did was in the "sphere of legitimate legislative activity." The City Council asked for a delay in the processing of the grading permit to conduct an investigation of possible changed conditions in the Mission Springs subdivision. Investigation by legislative bodies so as to inform policy decisions is a quintessential legislative function. "The power of Congress to conduct investigations is inherent in the legislative process." Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957). "The power to investigate is necessarily incident to the power to legislate and to do so wisely." United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir.1984). All the City Council did here was investigate. That was a purely legislative act and the individual councilmembers should not be made to answer for it "in any other Place."[22]

CONCLUSION
This is not a difficult case. First principles of statutory construction, recognition of the prime responsibility of government at all levels to maintain public health and safety, and plain common sense compel affirming the trial court. The majority of this Court seems intent, however, on punishing the City of Spokane, not for what it did, but for what its city attorney said. In so doing, the Court guts a statute sensibly designed to balance development rights with legitimate public health and safety concerns. This is bad public *275 policy based on a zealous, tortured reading of the law and facts in this case.
In summary, RCW 58.17.170, read properly, permits a governing authority to take whatever action it deems necessary, in the event of changed conditions affecting an approved but not yet developed subdivision, to ensure public health and safety are not compromised in the development of the approved subdivision. I would affirm the trial court's dismissal of Mission Springs' action.
JOHNSON, J., concurs.
NOTES
[1] We refer to both appellants collectively by this title and do not attempt to segregate their positions for the purpose of this opinion.
[2] Certain defendants asserted counterclaims which were likewise dismissed. We do not reverse dismissal of those counterclaims as no cross-appeal is before us. RAP 5.2(f). We do, however, affirm dismissal of claims against council defendants Barnes and Crosby who did not participate in the fateful council meeting of June 22, 1995, and whose presence in this litigation in only their official capacity is unnecessary.
[3] The record does not contain the exact number of buildings within the project, but does reflect that there are 24 units per building.
[4] Additional information was also submitted at the City's request on February 7, 1995. However, the applicant did not further supplement the application prior to permit issuance in November.
[5] Some pleadings reference the date of the meeting as June 26, 1995, e.g., Clerk's Papers (CP) at 73; however, the exact date is not dispositive.
[6] See also Building Official Bob Eugene's letters of June 12, 1995 to same effect. CP at 100, 101.
[7] By standard procedure Spokane will not accept payment of the fee until the City has independently calculated the fee based on the anticipated volume, see SMC 8.02.031(E), and is ready for the permit to be picked up at the counter. Here the City did not notify the applicant the permit was ready until November 1, 1995 at which time the fee was paid and the permit was picked up. CP at 534-35.
[8] These are the same tunnels that were in existence for years prior to original project approval in 1992.
[9] Council Member Anderson abstained from the Spokane City Council action on August 14, claiming he was abstaining only because he had been advised he would not be indemnified by the City if he did not demur to repeal of the motion. CP at 272.
[10] 64.40.020. Applicant for permit Actions for damages from governmental actions. (1) Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.

(2) The prevailing party in an action brought pursuant to this chapter may be entitled to reasonable costs and attorney's fees.
(3) No cause of action is created for relief from unintentional procedural or ministerial errors of an agency.
(4) Invalidation of any regulation in effect prior to the date an application for a permit is filed with the agency shall not constitute a cause of action under this chapter.
[11] 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
42 U.S.C.1983.
[12] RCW 58.17.033 ("A proposed division of land... shall be considered under the subdivision or short subdivision ordinance, and zoning or other land use control ordinances, in effect on the land at the time a fully completed application for preliminary plat approval ... has been submitted...."). The rights so vested include the right to develop and improve "according to the laws in effect at the time they make completed application for subdivision or short subdivision of their property." Noble Manor Co. v. Pierce County, 133 Wash.2d 269, 280, 943 P.2d 1378 (1997).
[13] Mission Springs satisfied all state environmental act prerequisites for phase one of the development, as well all Department of Transportation requirements. CP at 75-76.
[14] A subdivision is governed by the terms of approval of the final plat and those statutes, ordinances, and regulations then in effect for five years thereafter unless the legislative body finds a change in conditions creates a serious threat to the public health or safety in the subdivision. Contrary to the claim of the dissent at page 14, such a proper finding may be made at any time without regard to whether or not a grading permit has issued. The effect of such finding would be to negate that vesting required by RCW 58.17.170.
[15] Property interests are not created by the constitution but are reasonable expectations of entitlement derived from independent sources such as state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).
[16] Bateson has been relied upon in federal precedent too numerous to recite, has never been overruled, and we have relied upon Bateson on numerous prior occasions as well. See, e.g., RJL Assocs., Inc. v. City of Seattle, 113 Wash.2d 402, 412, 780 P.2d 838 (1989); Sintra, 119 Wash.2d at 20, 829 P.2d 765; Robinson v. City of Seattle, 119 Wash.2d 34, 61, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 124, 829 P.2d 746 (1992), cert. denied, 506 U.S. 1079, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993); Cox, 72 Wash.App. at 8, 863 P.2d 578.
[17] The administrative nature of the action was conceded during council debate. See, e.g., infra at 254 ("The council has no administrative authority by the terms of the city charter."). City Manager Roger Crum also attested by affidavit: "Grading permits are issued by the City's building official, who is under my administrative authority. The City Council has no authority to direct the building official." CP at 285. The Spokane City Charter creates an administrative branch under the direction of the city manager to process permits and otherwise administer its affairs. See Spokane City Charter, art. IV, 22(b), which expressly provides: "[N]either the city council nor any member thereof shall give orders to any subordinate of the city under the jurisdiction of the city manager...."
[1] Mission Springs' grading permit related to grading a road to access the Mission Springs' site, as well as grading the entire PUD site.
[2] The City also sought confirmation that John D. (Dan) Clardy, one of the primary movers in the Mission Springs' project, retained authority to act for Mission Springs. Mr. Clardy had been the subject of articles in the Spokane press starting in July 1993, attributing misconduct to him. Clardy later sued Cowles Publishing, owner of the Spokane daily newspapers, for defamation in January 1994. Clardy, 81 Wash.App. at 56-57, 912 P.2d 1078. Clardy's precise role in this case is somewhat of a mystery. The plaintiffs below are Mission Springs, Inc., a Washington corporation, and Feature Realty, Inc., a California corporation. Clardy has described himself as "managing Agent for plaintiffs." Clerk's Papers at 102. His relationship to Mission Springs is not an issue on appeal.
[3] There is nothing in the record to indicate Spokane objected to lack of a traffic study from Mission Springs until after Mission Springs had commenced this action. Taylor Engineering, the firm that supplied the February 1995 letter containing the traffic counts, apparently had some interest in the Mission Springs property. Taylor Engineering was a named defendant in the adverse possession suit brought against the Mission Springs property. Declaration of Dan Clardy at 4; Clerk's Papers at 105. Apparently, no one expressed any conflict of interest concerns on receiving an engineering report on property the engineering firm had a business interest in. See RCW 18.43.105(7), defining "misconduct or malpractice in the practice of engineering": "Conflict of interest... allowing an interest in any business to affect a decision regarding engineering work for which retained, employed, or called upon to perform."
[4] The DeBills filed their adverse possession suit on January 12, 1994, contending they owned one lot in the Mission Springs plat. Thus, both Spokane and Mission Springs, as defendants in the DeBills' suit, were well aware of the adverse possession claim when Mission Springs applied for the grading permit on October 13, 1994.
[5] RCW 58.17.165 provides, in pertinent part:

Every final plat or short plat of a subdivision or short subdivision filed for record must contain a certificate giving a full and correct description of the lands divided as they appear on the plat or short plat, including a statement that the subdivision or short subdivision has been made with the free consent and in accordance with the desires of the owner or owners.
... Said certificate or instrument of dedication shall be signed and acknowledged before a notary public by all parties having any ownership interest in the lands subdivided and recorded as part of the final plat.
[6] Clardy also stated in the same affidavit: "The refusal of the City of Spokane to issue the permit until the DeBill lawsuit was settled was the principal reason for the lengthy delay in the issuance of the permit." Clerk's Papers at 502. Mission Springs does not claim the DeBills' lawsuit was pretextual or the City's handling of it was in any way improper. Absent such a claim and given this admission by Mission Springs' agent, the City's alleged delay from June 22 to August 15 was not the proximate cause of the harm Mission Springs alleges. I would affirm the grant of summary judgment on this basis alone.
[7] The trial court held Mission Springs' failure to pay the permit fee before October 30, 1995, prevented Mission Springs from obtaining any vested right to the permit. Mission Springs assigned error to this holding. Br. of Appellants at 5. Although the majority reverses the summary judgment in favor of the respondents, and remands the case for trial consistent with its opinion, it does not discuss the assignment of error or provide a disposition of the trial court's ruling. Presumably, the trial court's ruling on this issue stands.
[8] Mission Springs filed the current action a scant seven working days after the June 22 meeting, but over eight months after it first applied for the grading permit. There can be little doubt the City Council meeting was the triggering factor in this action.
[9] The merits of the City's assessment of a potential threat to public safety are, of course, not at issue. The focus is on the meaning and applicability of the statute. Presumably, if a municipality made an insupportable determination of changed conditions, an aggrieved party would find redress in the courts.
[10] "[W]hen a court is urged to reach a result that could not be made intelligiblethat must seem ridiculousto educated lay persons, it is a hint that the result may be wrong as a matter of law." Byron v. Clay, 867 F.2d 1049, 1053 (7th Cir. 1989).
[11] This is not to say the governing authority may act arbitrarily or capriciously in doing so as, for instance, by imposition of an unreasonable delay. It is possible to conceive of circumstances in which a jurisdiction artificially creates permit or other requirements solely to delay a project until completion of it became financially unfeasible or until the five-year sunset term had expired, invalidating the plat. In such case, the development proponent would surely have a cause of action. If it is arbitrary or unreasonable in its action, the City would be subject to the civil liability provisions of RCW 64.40. The question of the length of delay in this case is not before us, however. The majority is adamant that any delay whatsoever is a violation of constitutional magnitude.
[12] Mission Springs argues Councilmembers Holmes and Anderson had been vocal opponents of the Mission Springs development before being elected to the Spokane City Council. Br. of Appellants at 6-7. In fact, Councilmember Holmes was a member of the neighborhood group leading the opposition to the development. Perhaps her successful election resulted in part from her opposition to Mission Springs' project. I see nothing wrong with this state of affairs. I agree with Judge Posner that politics "is not merely, or even primarily, the disinterested pursuit of the public interest. It is a power struggle." Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart, 864 F.2d 551, 555 (7th Cir. 1988). When acting in its legislative, as opposed to its quasi-judicial, capacity as it did here, a city council is designed to be a partisan body, legitimately reflecting the wishes of its constituents.
[13] The majority says, "[Spokane Municipal Code] 4.03.020 permits no delay in the issuance of a building or grading permit while the municipality rethinks plat approval which it had granted years previously." Majority op. at 258. By its choice of words, the majority evidently intends to convey the impression the City violated its own municipal code. In fact, the SMC is silent on the question of delay. While it does not expressly or impliedly permit delay, it also does not expressly or impliedly forbid delay. The Code does, however, allow for latitude in administering permits, a point the majority fails to mention: "The building official may waive or modify the requirements for an application as the nature of the work applied for dictates." SMC 11.02.0810(B)(3). The permit requirements subject to the building official's modification are set forth at SMC 11.02.0810(A).
[14] The United States Supreme Court and nearly all of the federal circuit courts of appeals have agreed. Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944) ("Mere violation of a state statute does not infringe the federal Constitution."); Barney v. City of New York, 193 U.S. 430, 437-38, 24 S.Ct. 502, 503, 48 L.Ed. 737 (1904) ("Controversies over violations of the laws of New York are controversies to be dealt with by the courts of the State ... the principle is that it is for the state courts to remedy acts of state officers done without the authority of or contrary to state law."); Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, however, that violations of state laweven where arbitrary, capricious, or undertaken in bad faithdo not, without more, give rise to a denial of substantive due process under the U.S. Constitution."); Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 684 (3d Cir.1991) ("a violation of state law in itself does not constitute a denial of substantive due process."), cert. denied, 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 825 (4th Cir. 1995) (illegal or arbitrary act under state law is not alone probative of a constitutional violation); Stern v. Tarrant County Hosp. Dist., 778 F.2d 1052, 1056 (5th Cir.1985) ("Converting alleged violations of state law into federal ... due process claims improperly bootstraps state law into the Constitution."), cert. denied, 476 U.S. 1108, 106 S.Ct. 1957, 90 L. Ed.2d 365 (1986); Olsen v. McFaul, 843 F.2d 918, 929 (6th Cir.1988) ("[T]he violation of a state statute or rule of practice does not, by itself, constitute deprivation of a right guaranteed by the Constitution of the United States. Misapplication of State law, absent invidious discrimination, does not necessarily present a federal constitutional question."); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 467 (7th Cir.1988) ("A violation of state law is not a denial of due process."); Steuart v. Suskie, 867 F.2d 1148, 1150 (8th Cir.1989) ("The doctrine of substantive due process is reserved for a narrow class of cases, usually involving some egregiously unfair or shocking act of governmental oppression. Steuart here claims a violation by HUD of its own personnel procedures. If such a claim raises substantive-due-process concerns, every claim by a citizen that any government has violated a statute, regulation, or procedure, in such a way as adversely to affect `liberty' or `property,' would create a constitutional lawsuit. The heavy artillery of constitutional litigation is not available on such an indiscriminate basis."); Phillips v. Calhoun, 956 F.2d 949, 954 (10th Cir. 1992) ("[N]oncompliance with local law does not constitute a violation of federal due process rights.").
[15] I have previously stated my belief in the appropriate demise of substantive due process in land use cases: "`Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit.'" Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 667, 946 P.2d 768 (1997) (Talmadge, J., concurring) (quoting Armendariz v. Penman, 75 F.3d 1311, 1325-26 (9th Cir. 1996)). Nevertheless, substantive due process remains the law of Washington, and I, unlike the majority, believe I am obliged to conform my analysis to that law until such time as this Court sees fit to change it. The majority attempts to relegate the Armendariz case to insignificance by implying parenthetically it applies only to rarely seen private taking claims. Majority op. at 258. While it is true Armendariz did concern a private taking claim, neither the language nor the import of that landmark, en banc decision limits its holding with respect to the inapplicability of substantive due process analysis to claims more properly advanced under the Fifth Amendment's just compensation clause. To the extent Armendariz could have left any lingering doubts, the subsequent decision of the Court of Appeals for the Ninth Circuit in Maori v. King County, 110 F.3d 1496, 1500 (9th Cir.) (quoting as authority the language from Armendariz cited supra, this paragraph), amended and superseded on denial of reh'g en banc, 126 F.3d 1125 (1997), cert. denied, ___ U.S.___, 118 S.Ct. 1178, ___ L.Ed.2d ___ (1998), a case involving a claim against a public agency, erased them. The United States Supreme Court's denial of the petition for certiorari in Macri is significant, given the nature of the case and the Court's well known lack of reluctance to overturn Ninth Circuit cases.
[16] This language comes from Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894). The Lawton three-pronged test was promulgated as a touchstone for excessive exercise of the police power. Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). In Orion, however, we conflated the Lawton police power test with substantive due process. Orion, 109 Wash.2d at 646, 747 P.2d 1062. So far as I know, we are the only jurisdiction to have done so.
[17] The majority also cites Bateson as authority for the proposition "Arbitrary or irrational refusal or interference with processing a land use permit violates substantive due process." Majority op. at 261. The majority asserts at 257 n. 15 that Bateson has never been overruled. That statement is plainly incorrect in view of Armendariz and Maori. Armendariz said: "To the extent Sinaloa [Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398 (9th Cir. 1989)] stands for the proposition that a plaintiff may bring a substantive due process claim whenever his other claims are unsuccessful, we overrule it now." Armendariz, 75 F.3d at 1326. Bateson is no longer sound in light of these recent decisions.
[18] The majority concludes no taking occurred here. Majority op. at 258. I agree for the same reasons a federal constitutional tort for violating Mission Springs' right to due process is not present. The City's resolution calling for an additional traffic study was an exercise of its police power to safeguard the public interest in safety. Therefore, it was not a taking.
[19] In a council-manager plan of city government, "The council shall appoint an officer whose title shall be `city manager' who shall be the chief executive officer and head of the administrative branch of city or town government. The city manager shall be responsible to the council for the proper administration of all affairs of the city or town." RCW 35.18.010.
[20] As the city attorney told the City Council in the course of warning the City Council of its exposure to liability, "[T]he council has no administrative authority by the terms of the city charter."
[21] It is well to remember that immunizing the individual councilmembers does not leave Mission Springs without a remedy. There is no question that the City of Spokane itself may be liable for the conduct of its elected officials, officers, and agents under 1983. This has been settled law since Monell v. Department of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Moreover, a municipality is not immune from suit even if its municipal officers are immune. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).
[22] The trial court did not address qualified immunity; neither should we.