[No. 17059-4-III.   Division Three.   February 16, 1999.]

BRENT M. LARSEN, ET AL., *Respondents*, v. THE TOWN OF COLTON, *Defendant*, CHARLES TILTON, ET AL., *Appellants*.

---

*Peter A. Volk* of *Irwin, Myklebust, Savage & Brown, P.S.,* for appellants.

*Timothy H. Esser* of *Nuxoll, Libey, Ensley, Esser & Campbell,* for respondents.

KATO, J. — Charles and Susan Tilton appeal a superior court order enjoining them from building a garage or shop on their Colton property. They contend the Land Use Petition Act (LUPA), RCW 36.70C, provides the exclusive remedy here and the action was not filed within the applicable limitation period. They also contend the superior court erred in concluding Colton's zoning ordinance prohibited construction of the building. We affirm.

The Tiltons own two partially adjacent residential lots (Lots 2 and 3) in Colton. A third lot (Lot 1), owned by Brent and Cherie Larsen, abuts the Tiltons' two lots on two sides. The lots are located roughly as follows:

The area consists of new, well-built, nicely maintained homes. There are no businesses or unsightly vacant lots in the area. The Larsens live in a single-family home on Lot 1. The Tiltons began building a single-family home, including an attached two-car garage, on Lot 3.

In October 1996, Mr. Larsen saw Mr. Tilton laying out stakes on Lot 2. Mr. Tilton told Mr. Larsen he was planning to build a shop there. Mr. Tilton intended to use the structure as a place to pursue his hobby of restoring old vehicles. He told Mr. Larsen he planned eventually to move

out of and sell the house on Lot 3 and to sell the structure on Lot 2 separately.

Mr. Larsen investigated the town's zoning ordinance and believed construction of the building on Lot 2 would be improper. He discussed his concerns with the Town Council during regular meetings in November and December 1996 and January 1997. During a meeting on February 3, 1997, the city attorney advised the council that under the town's zoning ordinance the structure could be built as an accessory to the home on Lot 3 if the structure was not used for business purposes. The city attorney also opined that if Lot 2 ever was sold separately from Lot 3, the new owner of Lot 2 would have to build a new home there or tear down the structure. On this basis, the council concluded a building permit could be issued for the structure.

Two days later, the mayor signed a building permit on behalf of the building inspector, who was away on vacation. There was no written application for the permit, although in January 1997 the Tiltons submitted rough drawings indicating the building would be 32 feet wide, 44 feet long, and 18½ feet high, with two garage doors on one end and one on the other end.[1] Although there was no formal application for a building permit, the Larsens had actual knowledge of the dimensions of the structure the Tiltons intended to build.

When the building inspector returned from vacation, he told Mr. Larsen the building permit had not been issued. The town clerk placed the building permit in her normal building-permit file. Sometime in February 1997, Mr. Larsen asked to look in "the file applicable to construction of structures in the Town of Colton." He did not find the Tilton building permit in the file.

In the last week of February 1997, the Tiltons began preparing Lot 2 for construction of the building by leveling the pad, staking out the dimensions, compacting gravel, and pouring cement.

---

[1]Apparently in an attempt to address the Larsens' concerns by making the building look more like the house, Mr. Tilton later reduced the size of the building to 32 feet by 40 feet, but increased its height to 21 feet.

The Larsens became specifically aware that a building permit had been issued on May 6, 1997. They filed a complaint for injunctive relief seven days later. The complaint did not refer to LUPA. The superior court issued a temporary restraining order halting construction on May 14. The court conducted an evidentiary hearing on May 22. At that hearing, the issues were whether the Larsens filed the action within the applicable limitation period, whether the town's zoning ordinance barred construction of the building, and whether the town was estopped from enforcing the ordinance by failing to enforce it in the past. The parties did not address the potential application of LUPA.

In a letter opinion filed on June 18, the superior court concluded:

> The issuance of the Tilton building permit was not a question requiring a hearing, and a Statute of Limitations did not necessarily commence running on the date on which the permit was issued, which was apparently February 5, 1997.

> The plans for the building consisted only of a hand-written outline of the outside dimensions. The permit was issued for a two-car garage. Future plans for the use of the building were quite imprecise. Mr. Larsen had no way to know what the actual construction would be and the purpose to which the building would be put until a later time. The permit on its face may well have been justified under the ordinance, whereas the contemplated building would be in violation based on it[s] actual use.

> The court is using the reasonable time standard, since, in the court's opinion, neither party has suggested an appropriate analogy.

> Mr. Larsen appears to have commenced his lawsuit within a reasonable time after being able to recognize the building's respective size, use, and the impact thereof on the neighborhood.

> A situation can well be imagined where an applicant receives a routine permit for a two-car garage, builds the structure, and violation of the zoning ordinance is not apparent until the building owner commences a mechanical repair business in the building, this being a use specifically prevented by the ordinance.

Defendant's pleading of the Statute of Limitations is an affirmative defense. The defendant has not proven by a preponderance of the evidence that the plaintiff received a copy of the building permit on February 5, or exactly when the plaintiff should have been sufficiently alarmed that construction would be in violation of the ordinance, and that more than a reasonable time had passed thereafter prior to the institution of suit.

Plaintiff had told defendant that the building was going to be a shop. As to the time one would be alarmed about a possible violation of the ordinance, this word, standing alone, is ambiguous.

The court thus concluded the action was timely filed. However, it declined to address the merits of the complaint, urged the parties to settle the dispute privately, and invited additional briefing. After this briefing, the court concluded the building would violate the Colton zoning ordinance because it would not be "an accessory building such as is ordinarily appurtenant to a dwelling house." The court also held the Tiltons had not proved the town had failed to enforce the ordinance in other areas.

In September 1997, the Tiltons moved for reconsideration, for the first time contending LUPA applied and, because the Larsens' action was not properly filed within 21 days as required by RCW 36.70C.040(2), the superior court lacked subject matter jurisdiction. The court concluded the Tiltons had waived their defense based on RCW 36.70C by failing to timely raise it. In its oral decision, the court also noted that strict adherence to the 21-day limitation period would raise due process concerns.

On the merits of the case, the court held the Tiltons' proposed structure would not be "an accessory building such as is ordinarily appurtenant to a dwelling house" and "would have been built to be used independently of a dwelling, on a large, separate and distinct building site." The court also concluded that the Tiltons' common ownership of Lots 2 and 3 did not make the proposed structure on Lot 2 appurtenant or accessory to their home on Lot 3.

The Tiltons now appeal from the superior court's judg-

ment permanently enjoining them from building the structure and ordering the town to revoke the building permit.[2]

We first consider whether the court erred in declining to apply the LUPA. LUPA provides for judicial review of a land use decision, which is defined as:

a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:

(a) An application for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, or used, but excluding applications for permits or approvals to use, vacate, or transfer streets, parks, and similar types of public property; excluding applications for legislative approvals such as area-wide rezones and annexations; and excluding applications for business licenses;

(b) An interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and

(c) The enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property. However, when a local jurisdiction is required by law to enforce the ordinances in a court of limited jurisdiction, a petition may not be brought under this chapter.

RCW 36.70C.020(1).

With some exceptions not applicable here,[3] LUPA is the exclusive means of obtaining judicial review of land use decisions. RCW 36.70C.030(1). It requires an aggrieved person to file a petition within 21 days of the issuance of the land

[2]The Town of Colton has not appealed the decision.

[3]LUPA replaces the writ of certiorari as a means of obtaining review of land use decisions. RCW 36.70C.030(1). It does not preclude judicial review of applications for writs of mandamus or prohibition. RCW 36.70C.030(1)(b); *but see* RCW 7.16.360.

use decision.[4] RCW 36.70C.040(3). However, the defense of untimely filing of a petition is waived if not raised at an initial hearing, which is required to be conducted 35 to 50 days after the petition is filed. RCW 36.70C.080(1), (3).

The Tiltons argue LUPA supersedes all other avenues of relief, that the Larsens' failure to comply with the Act's procedural requirements renders the court's decision invalid, and that the Tiltons' own failure to assert the timeliness defense should be excused by the Larsens' failure to provide notice that this was a LUPA proceeding.

■ The short answer to this argument is that the Larsens were not required to comply with LUPA because they did not have standing to pursue its remedies. Standing is limited to the applicant or landowner and to any person "aggrieved or adversely affected by the land use decision." RCW 36.70C.060(1)-(2).

> A person is aggrieved or adversely affected within the meaning of this section only when all of the following conditions are present:
>
> (a) The land use decision has prejudiced or is likely to prejudice that person;
>
> (b) That person's asserted interests are among those that the local jurisdiction was required to consider when it made the land use decision;
>
> (c) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the land use decision; and
>
> (d) The petitioner has exhausted his or her administrative remedies to the extent required by law.

RCW 36.70C.060(2).

---

[4]RCW 36.70C.040(4) defines the date of issuance as:

"(a) Three days after a written decision is mailed by the local jurisdiction or, if not mailed, the date on which the local jurisdiction provides notice that a written decision is publicly available;

"(b) If the land use decision is made by ordinance or resolution by a legislative body sitting in a quasi-judicial capacity, the date the body passes the ordinance or resolution; or

The critical element here is subsection (b). The sole question before the town in issuing its building permit was whether the Tiltons' proposed structure met the requirements of the zoning ordinance. An applicant for a building or grading permit is entitled to its immediate issuance upon satisfaction of the relevant ordinance's criteria. *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 960, 954 P.2d 250 (1998). The building inspector (or in this case the mayor acting in the building inspector's absence) was not *required* to consider the Larsens' interests.[5] That the Larsens raised their concerns with the town council does not suggest the permit issuer was *required* to consider the Larsens' asserted interests. The Larsens therefore lacked standing to appeal the issuance of the building permit under LUPA, and the superior court did not err in declining to apply its procedural requirements.[6]

■ An action for injunctive relief is an appropriate way for an aggrieved property owner to contest erection of a structure he believes to be in violation of a zoning ordinance. *Radach v. Gunderson*, 39 Wn. App. 392, 399, 695 P.2d 128, *review denied*, 103 Wn.2d 1027 (1985).

The Tiltons contend nevertheless that the Larsens' complaint for an injunction was untimely. This argument assumes the Larsens' complaint was for some specific act that occurred in the past. However, by its nature an injunction is directed at *continuing* conduct. Indeed, an action for damages—not for an injunction—is the proper remedy for injury resulting from past conduct. *State ex rel. Twiss v. Superior Court*, 93 Wash. 429, 431-32, 161 P. 68 (1916).

"(c) If neither (a) nor (b) of this subsection applies, the date the decision is entered into the public record."

[5] In light of *Mission Springs*, the Tiltons in another context undoubtedly would argue vigorously not only that the town was not *required* to consider the Larsens' concerns, but also that it was not *permitted* to.

[6] As the superior court recognized, applying LUPA here would raise serious due process concerns. If the Act's 21-day limitation period applies to all persons potentially affected or aggrieved by issuance of building permits, those persons would be required to regularly inspect public records for building permits that affect their interests. Failure to inspect the public records and file a petition within 21 days of issuance of a permit would bar judicial review, even though those persons previously had not been afforded an opportunity to assert their interests.

Violation of a zoning ordinance thus is a continuing violation, the remedy for which is an injunction. *Radach,* 39 Wn. App. at 399.

Because the Larsens alleged the Tiltons' structure would result in a *continuing* violation of the zoning ordinance, it would make no sense to apply a limitation period that refers to an act in the past. It was the potentially continuing violation, not some past conduct, that formed the heart of the Larsens' complaint.

The Tiltons, focusing on the portion of the Larsens' complaint seeking declaratory relief, rely on *Brutsche v. City of Kent,* 78 Wn. App. 370, 898 P.2d 319, *review denied,* 128 Wn.2d 1003 (1995). In *Brutsche,* the plaintiff brought a declaratory judgment action alleging amendments to a city's zoning ordinance were unconstitutional. Addressing the city's argument the action was untimely, the court held a declaratory judgment action must be initiated within a "reasonable time." *Id.* at 376. " 'What constitutes a reasonable time is determined by analogy to the time allowed for appeal of a similar decision as prescribed by statute, rule of court, or other provision.' " *Id.* (quoting *City of Federal Way v. King County,* 62 Wn. App. 530, 536-37, 815 P.2d 790 (1991)). The court concluded:

> We hold that where, as here, there is no other appeal period prescribed by state statute or local ordinance governing the type of land use action involved, the *appeal* must be brought within 30 days of the municipality's or agency's final decision. Such a bright line rule will serve the public interest by giving decision makers, land owners and citizens a clear deadline by which a land use decision, if not appealed, is final. *See [Concerned Organized Women & People Opposed to Offensive Proposals, Inc. v. City of Arlington,* 69 Wn. App. 209, 217-18, 847 P.2d 963, *review denied,* 122 Wn.2d 1014 (1993)]; *Federal Way,* 62 Wn. App. at 538; *Deschenes v. King County,* 83 Wn.2d 714, 717, 521 P.2d 1181 (1974). Since Brutsche did not commence his action until 73 days after the zoning ordinances were enacted, the trial court correctly dismissed the action on the ground that it was untimely filed.

*Brutsche,* 78 Wn. App. at 380 (emphasis added) (footnotes omitted).

As this quotation makes clear, the action in *Brutsche* was an *appeal* of a quasi-judicial rezoning decision affecting the plaintiff's property. The plaintiff obviously was a party to and thus had actual knowledge of the decision at issue. In that circumstance, a short limitation period is justified by the state's policy of reviewing land use decisions expeditiously. *Brutsche,* 78 Wn. App. at 377 (citing *Federal Way,* 62 Wn. App. at 538).

But when, as in this case, the land use decision is a purely ministerial act, the aggrieved person may not have notice or actual knowledge. Indeed, a neighbor's only notice that a building permit has issued may be the beginning of construction. As the superior court recognized, applying *Brutsche*'s bright-line rule to this situation would allow a landowner to avoid any judicial review by obtaining a building permit and waiting 30 days before beginning construction. A short limitation period beginning with the issuance of the building permit would not be reasonable.

██ Actual or constructive[7] knowledge of the building permit thus should be the triggering event for a reasonable limitation period. Here, as the superior court found, the Larsens became specifically aware that the building permit had been issued on May 6, 1997.[8] They initiated this action a week later, which certainly was within a reasonable time. The superior court did not err in holding this action was timely.

██ We next consider the substance of this appeal,

[7]The beginning of construction may give a neighbor constructive knowledge of the permit. In this case, although there was some earlier site preparation work, Mr. Larsen testified the digging for the foundation on Lot 2 began around May 6, 1997.

[8]The Tiltons contend the Larsens had actual knowledge as early as February 3, 1997, when the town council decided the permit would be issued. However, the permit was not issued at that meeting. The mayor signed the permit two days later. Mr. Larsen attempted to determine whether the permit had been issued, but he was unable to find it in the clerk's file and at one point was told no permit had been issued. Substantial evidence supports the court's finding the Larsens did not have knowledge of the permit until May 6, 1997.

which is whether Colton's zoning ordinance prohibited the Tiltons' proposed structure. Interpretation of a zoning ordinance is a question of law. *City of Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 107, 371 P.2d 1009 (1962). Zoning ordinances are construed liberally to accomplish their purpose, but they must not be extended "beyond the clear scope of legislative intent as manifest in their language." *Keller v. City of Bellingham*, 92 Wn.2d 726, 730, 600 P.2d 1276 (1979) (citing *State ex rel. Standard Mining & Dev. Corp. v. City of Auburn*, 82 Wn.2d 321, 510 P.2d 647 (1973)).

Colton's zoning ordinance provides in pertinent part:

> Section 4: In the Residential Zone, no building or premises shall hereafter be used, and no building shall hereafter be erected or structurally altered, unless otherwise provided for herein, except for one or more of the following uses:
>
> (a) Single family dwellings . . . .
>
> (b) Accessory buildings such as ordinar[ily] appurtenant to dwelling houses.
>
> (c) Garages for not to exceed two automobiles, but no repair shop, service station, or other business shall be conducted therein.

The Tiltons' building permit was issued for construction of a two-car garage. However, their house on Lot 3 had an attached two-car garage. While the ordinance arguably permits more than one garage, under subsection (c) the total garage space cannot exceed that for two automobiles. The structure was not permitted under subsection (c).

The Tiltons point out, however, that everyone involved (including the Larsens and the town officials) knew the proposed dimensions of the building and its proposed use. In this circumstance, as the Tiltons argue, it would be a pointless exercise in semantics to invalidate the permit on this ground and to leave unresolved the question all the parties and the court understood to be at issue: Whether, under subsection (b), the proposed structure would be an accessory building such as is ordinarily appurtenant to a dwelling house.

■ Although the Tiltons offer dictionary definitions of various terms used in the ordinance, the basic question is whether a structure may be deemed "appurtenant" to a house when it is built on a lot separate from the house. This question was resolved in *Sandy Point Improvement Co. v. Huber*, 26 Wn. App. 317, 318, 613 P.2d 160 (1980), in which the owner of adjacent lots started construction of a storage building on one of the lots. A covenant prohibited use of the property for anything other than residential purposes.[9] *Id.* Noting that a garage is a proper appurtenance to a dwelling and is not a violation of such a covenant, the court nevertheless held that if a garage is built on an adjoining lot, it is no longer appurtenant and violates the covenant even if it is used in connection with the dwelling on the adjoining lot. *Sandy Point*, 26 Wn. App. at 320 (citing *Biltmore Dev. Co. v. Kohn*, 239 Ky. 460, 39 S.W.2d 687 (1931)). Under this reasoning, the Tiltons' proposed structure cannot be appurtenant to their residence on Lot 3 because it would be built on a separate lot.

The Tiltons contend, however, that their two lots combined should be considered one lot for these purposes. They rely in part on *Talbot v. Gray*, 11 Wn. App. 807, 525 P.2d 801 (1974), *review denied*, 85 Wn.2d 1001 (1975), which does not support their argument. In *Talbot*, the owners of an irregularly shaped lakefront lot sought to build a dock on the shoreline. Neighbors, relying on an ordinance defining the rear lot line of an irregularly shaped parcel,[10] contended the owners' lot did not extend to the shoreline. *Id.* at 810. The court rejected this absurd contention by recognizing that the area where the dock was to be built

---

[9]The Tiltons attempt to distinguish *Sandy Point* on the basis that it interpreted a restrictive covenant rather than a zoning ordinance. However, the rules for interpretation of covenants are strikingly similar to those for interpreting zoning ordinances. *See Sandy Point*, 26 Wn. App. at 320 ("Restrictive covenants upon the use of real property will not be extended beyond the clear meaning of the language used."). Regardless of the differences in context, the *Sandy Point* holding clearly is applicable here.

[10]The ordinance's purpose in determining a rear lot line was to define a rear yard, the permitted uses for which also were established by ordinance. *Talbot*, 11 Wn. App. at 810-11.

was actually "within the property lines bounding the lot." *Id.* at 811. *Talbot* does not support the Tiltons' argument that more than one lot may be considered a single parcel.

The Tiltons also rely on the Pennsylvania Supreme Court's decision in *Appeal of Fisher*, 355 Pa. 364, 365-66, 49 A.2d 626 (1946), in which the landowners built a barn straddling two lots. The court held the barn was appurtenant to the dwelling on one of the lots; the two lots together were treated as one parcel because the owners had developed, used, and fenced the land as one property. *Id.* at 367-68. Here, there is no evidence the Tiltons used or fenced the two lots as a single property. Even in Pennsylvania, one lot will not be appurtenant to another on which the owner dwells if it is "physically disconnected from the dwelling and in fact unnecessary for the use and enjoyment thereof." *Charch v. Pennsylvania Pub. Util. Comm'n*, 183 Pa. Super. 371, 376, 132 A.2d 894 (1957).

The superior court correctly concluded the Tiltons' structure could not be appurtenant to their house on a separate lot. The structure thus was not permitted by Section 4(b) of Colton's zoning ordinance. The superior court properly enjoined the Tiltons from building the structure.

We affirm the superior court's judgment.[11]

KURTZ, A.C.J., and BROWN, J., concur.

---

[11]In light of our decision, we need not address the Tiltons' request for attorney fees.